687 So.2d 1002 (1997)
Dora Boutte MERRITT et al.
v.
Guler KARCIOGLU, M.D. et al.
Dora Boutte MERRITT et al.
v.
ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND et al.
Nos. 96-C-0431, 96-C-0454.
Supreme Court of Louisiana.
February 25, 1997.
Elaine Wills Selle, Donna Di Martino Fraiche, Locke, Purnell, Rain & Harrell, New Orleans, for Applicant (No. 96-C-0431).
Darleen Marie Jacobs, James L. Yates, Michelle Anne Bourque, Stewart Earl Niles, Jr., New Orleans, for Respondent (No. 96-C-0431).
Michelle Anne Bourque, Stewart Earl Niles, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for Applicant (No. 96-C-0454).
Darleen Marie Jacobs, James L. Yates, Locke, Purnell, Rain & Harrell, Elaine Wills Selle, Donna Di Martino Fraiche, New Orleans, for Respondent (No. 96-C-0454).
LEMMON, Justice.[*]
This is a medical malpractice action seeking to recover the damages sustained by the ninety-two-year old patient when she fell from a hospital bed, allegedly because the doctor and the hospital staff failed to monitor *1003 her properly or to use appropriate restraints. The lone issue on which this court granted certiorari is whether the jury abused its discretion in awarding $555,000 solely for the damages attributable to the broken hip sustained in the fall when the hip fracture was completely healed in seven weeks and the patient was suffering from numerous severe and debilitating cardiac, vascular and pulmonary conditions prior to her fall.

Facts
On October 7, 1988, Amy Boutte was admitted to the Tulane University Medical Center (TMC) with complaints of severe chest and stomach pain, epigastric pain, decreased appetite, nausea, vomiting and fever. The ninety-two-year old patient had been hospitalized at TMC for congestive heart failure and severe vascular disease five times since June 1987. The diagnosis in the October 1988 admission was viral pneumonia, and she was placed in the cardiac care unit under constant monitoring.
Three days later Ms. Boutte became disoriented and fell while attempting to get out of her hospital bed. The fall resulted in a fracture of the right hip.
The surgeon performed an open reduction and internal fixation of the hip. After a physical therapy regime, Ms. Boutte was discharged from the hospital ten days after the fall, at which time she was able to walk with a walker and assistance. By November 29, the fracture had completely healed, and she reported she was experiencing no pain. She did not return for a scheduled appointment in February.
On April 9, 1988, Ms. Boutte was admitted to TMC for sepsis, decubitus ulcers, dehydration, renal failure, anemia, acute pulmonary edema and severe peripheral vascular disease with gangrene of the toes. She died nine days later of heart failure.
Her heirs filed this action, seeking both survival and wrongful death damages. After trial on the merits, the jury, answering special interrogatories, found that the negligence of Dr. Guler Karcioglu and of Nurse Marcia Wolfe caused Mrs. Boutte's hip injury, but did not cause her death. Apportioning fault ten percent to the doctor, fifty-five percent to TMC and thirty-five percent to the nurse,[1] the jury awarded $555,000 in survival damages.[2]
On appeal by the doctor, the nurse, TMC and the Louisiana Patient Compensation Fund,[3] the court of appeal affirmed, but amended the judgment by reducing the award of damages to $500,000.[4] 668 So.2d 469. Citing Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), the court reasoned that the particular effect of the hip injury on this particular victim was "a diminution of the quality of life for the last seven months of her life."[5] 668 So.2d at 479.
On defendants' application, this court granted certiorari "as to general damages only."[6] 96-0431, 96-0454 (La.4/26/96); 672 So.2d 677, 678.

*1004 Appellate Review of General Damages Awards

Because Ms. Boutte did not die as a result of the fall caused by defendants' negligence, plaintiffs are only entitled to recover the damages that she sustained between the time of the fall and her death which are attributable to the hip injury. The critical issue is whether the jury abused its "much discretion" in awarding $555,000 for those damages. La. Civ.Code art.1999.
In Youn, 623 So.2d at 1260-61, this court discussed the troubling problems in appellate review of general damage awards, stating:
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La. Civ.Code art.1934(3) (1870). The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

Evidence Pertinent to General Damages
Because defendants' primary contention is that the award is not supported by the evidence, and particularly the medical evidence, it is appropriate to review in detail the medical evidence in the record.
Dr. Morris Kerstein, the chief of vascular surgery at TMC, first attended to Ms. Boutte in November 1986 for pain in both legs and for "cool, blue feet" caused by poor circulation. He diagnosed severe vascular disease, with underlying cardiac disease and some lung disease. An arteriogram in June 1987 showed virtually no circulation in the vessels below her knees. To complicate the problem, Ms. Boutte had an abdominal aneurysm *1005 which was threatening to rupture, but Dr. Kerstein couldn't perform surgery because of her severe heart problems. Expecting her to die or to lose her legs, he showed the patient and the family the x-rays and informed them of her limited longevity. At the time, she could walk using a quadwalker, but experienced great difficulty because of pain from lack of circulation in the legs. "On and off," according to the doctor, she developed ulcers on her feet caused by lack of circulation. Because her condition was constantly worsening and was not operable, Dr. Kerstein saw her every two or three weeks so that she "wouldn't get an infection I couldn't catch up with."
In November 1987, Ms. Boutte was hospitalized for gangrene in her toes. Dr. Kerstein treated her to prevent infection that would move up the leg, but the toes were "dead" and not subject to improvement.
In March 1988, Ms. Boutte developed cellulitis, an infection on the surface of the feet because of poor circulation. Dr. Kerstein treated her aggressively with antibiotics, attempting to "buy time," but warning that she was "never going to get better."
Dr. Karcioglu, an internist and specialist in geriatric medicine who had treated Ms. Boutte since April 1987, hospitalized her in September 1988 because of congestive heart failure and acute pulmonary edema. She was discharged in a week, but returned to the emergency room on October 7 with severe chest pain, nausea, vomiting and fever.[7] Dr. Karcioglu also diagnosed a dissecting aneurysm of the aorta and severe peripheral vascular disease which caused ulcers on her heels. She was placed in the coronary care unit where she was on the date of her fall.
After the fall, Dr. Raoul Rodriguez, an orthopedic surgeon, performed the open reduction. Following surgery, he ordered physical therapy which consisted of her sitting up and walking with a walker with assistance. According to the doctor, her walking was limited to "what her heart could tolerate." She was discharged to home health care eleven days after the surgery. In the discharge, Dr. Karcioglu reported that she was ambulatory, and her prognosis was good. Ms. Boutte then continued under the care of Dr. Rodriguez.
On October 26, the hip position was excellent, and Dr. Rodriguez advised Ms. Boutte to begin placing weight on her hip while walking with the walker. He noted that she was consulting Dr. Kerstein for leg circulation problems and pressure ulcers on her heels. He did not prescribe any medication.
On November 29, the fracture was "completely healed," and Ms. Boutte reported "virtually no pain in her right hip." He considered her, from an orthopedic standpoint, to be "in the same condition as just before the fracture." Not having seen her before the fall, he couldn't say that she was as mobile as she was before the fall, but he didn't believe that the fracture was a factor in any immobility that she may have been experiencing. He noted from the hospital records that "family members" reported Ms. Boutte before the accident had only been ambulatory short distances within her home using a cane.
Ms. Boutte was to return in three months to Dr. Rodriguez for an orthopedic follow-up, but did not return.
After the fall and surgery, Dr. Kerstein saw Ms. Boutte several times from her October *1006 discharge through January 10, 1989, and he observed non-healing ulcers of the heels. She used a walker when she came to the office, but walked short distances in the office without the walker.
Ms. Boutte did not return to Dr. Kerstein until March 21, 1989, when he found that her condition had "greatly deteriorated." He attributed her decline in part to her failure to visit him during the ten-week period. She had ulcers on her feet and decubitus ulcers on both buttocks. He diagnosed "end stage cardiac disease" and "end stage vascular disease," and informed the patient and family that she was going to die. He instructed the family that he would hospitalize her if caring for her at home was too difficult for them to handle.
Ms. Boutte was hospitalized again on April 9, 1989, and she died nine days later of heart failure.
Thus there was no medical evidence that connected Ms. Boutte's deterioration after January 10, 1989 with her October 10, 1988 fall. In fact, the medical evidence established that her hip injury healed completely and that she was virtually free of pain in about seven weeks. The medical evidence further established that the very elderly patient, before her fall, had severe cardiac disease that resulted in very poor circulation and severe vascular problems, particularly in her feet and lower legs, had an aortic aneurysm, and had severe pulmonary fibrosis, all of which required frequent medical attention to keep them under control and all of which could only worsen.
Plaintiffs relied on lay testimony to meet their burden of proving that the fall caused such a worsening of Ms. Boutte's condition as to justify the jury's award for damages resulting solely from the fall.
Ms. Boutte's daughter and principal caretaker testified that her mother was very active in church and community affairs before her fall; was the church organist for over fifty years until 1984; taught piano lessons (at unidentified times); was on the advisory board of a nursing home; was on the board of directors of a mortuary and attended board meetings monthly;[8] arranged for persons to host weekly rosary recitations; traveled to visit relatives, including a trip to Biloxi two months before the accident; and did her own shopping accompanied by her daughter. The daughter further testified that Ms. Boutte walked with a four-prong cane before the fall, but could only walk with a walker or had to use a wheelchair after the fall.[9] According to the daughter, Ms. Boutte after the surgery constantly complained of hip pain, could not stand up because of the severe pain, begged to remain in bed, and believed she had "nothing left to live for." Contrary to the medical evidence, the daughter asserted that the doctors did not tell them of her mother's congestive heart failure and severe vascular problems or of the impending danger of death or amputation caused by these problems. The daughter stated that her mother did not maintain treatment under Dr. Kerstein between November 1988 and March 1989 or keep scheduled appointments with Drs. Kerstein and Rodriguez because her mother was "tired."

Analysis of Damages Attributable to the Fall
Fear by elderly persons of falls and broken bones is a well known phenomenon. Undoubtedly, Ms. Boutte sustained considerable damages because of her fall attributable to defendants' negligence. Nevertheless, the overall record does not support the amount of damages determined by the jury to be the result of the fall.
The record establishes that Ms. Boutte was indeed a remarkable woman who suffered some decline in activity after her fall. However, the claims by plaintiffs of physical and mental deterioration caused by constant hip pain are contradicted by the totality of the medical evidence recorded mostly by independent doctors and medical personnel at unsuspicious times.
Prior to her fall, Ms. Boutte was afflicted with severe conditions that required five hospitalizations in sixteen months, followed by the October 1988 hospitalization for congestive *1007 heart failure and acute pulmonary edema. The conditions, all serious by themselves and even more grave in combination, clearly were worsening with time and were not operable or "fixable." The ulcers, then the gangrene, and then the cellulitis added to the basic diseases. Only aggressive and frequent treatments kept the conditions relatively under control.
After the surgery necessitated by the October 1988 fall while Ms. Boutte was in intensive care for these conditions, she returned for seven follow-up visits with Dr. Kerstein, Dr. Rodriguez and Dr. Karcioglu through January 10, 1989. Contrary to the testimony of Ms. Boutte's relatives, she reported to Dr. Rodriguez that she was virtually free of pain by November 29, after she had been instructed to place weight on the hip five weeks earlier. Significantly, Dr. Rodriguez opined that the hip fracture was not a factor in any immobility the patient may have been experiencing.
Dr. Kerstein, who was no longer associated with TMC at the time of trial, was the treating physician for the vascular problems that underlay her foot and leg complaints. He examined her four times between the surgery and January 10, 1989, and did not record any complaints of constant hip pain or of loss of the will to live that was claimed by her heirs. In fact, Dr. Kerstein's testimony reflected a particular attraction to and admiration for this patient, and he urged her to continue office visits every two or three weeks to "keep on top" of her many serious conditions. She did not return for ten weeks, and he attributed her "greatly deteriorated" condition on March 21, 1989 to this lack of treatment. In significant contrast to the January 10 visit, Ms. Boutte on March 21 was in the final stages of cardiac and vascular diseases.
Additionally, between November 1988 and March 1989, Ms. Boutte did not have the home health care and therapy prescribed by Dr. Rodriguez. It was during this period, after remarkable progress in the almost two months following surgery, that Ms. Boutte's condition declined significantly.
From this record it is evident that both the hip injury and the extremely serious pre-existing diseases combined, along with Ms. Boutte's advanced age, to cause the deterioration of her physical and mental conditions after October 1988. The jury apparently attributed most of the causation to the hip injury, but the record simply does not support such a conclusion. On this record, Ms. Boutte's preexisting and worsening conditions were the major cause of her decreased mobility and the other setbacks that diminished the quality of her life during her last seven months.
Under these particular circumstances regarding the effects of this particular injury to this particular plaintiff, the jury abused its discretion in awarding $555,000 for the damages solely attributable to the hip injury. Accordingly, this court must determine the highest award which was reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Analyzing the cases with similar injuries cited by both plaintiffs and defendants, we conclude that the highest award supported by the evidence was $150,000.
Decree
For these reasons, the judgments of the lower courts are amended to reduce the general damages in the survival action to $150,000. As amended, the judgments are affirmed.
WATSON, J., dissents and will assign reasons.
NOTES
[*] Johnson, J., not on panel. Rule IV, Part II, § 3.
[1] The jury found TMC vicariously liable because of the negligence of its nurse. In effect, the jury apportioned ninety percent actual fault to the nurse.
[2] Despite the jury's finding that defendants' negligence did not cause Ms. Boutte's death, the jury additionally awarded $610,000 in wrongful death damages, but the trial judge disallowed that award.
[3] The Fund intervened after the judgment of the trial court.
[4] The court reduced the judgment to $500,000, the maximum amount of general damages recoverable in medical malpractice cases. La.Rev. Stat. 40:1299.42B(1). Counsel for the plaintiffs had suggested $555,000 in closing argument, a figure that included $55,000 in medical expenses, but the court of appeal reduced the award to the maximum amount of general damages on the basis that the jury's verdict did not contain a special interrogatory, as required by La.Rev.Stat. 40:1299.43A, for the jury to find that Ms. Boutte was in need of future medical care and the amount thereof.
[5] One judge concurred, noting that "the quantum award appears to me to be disproportionate to the injuries sustained," but yielded to the discretion of the trier-of-fact. Id. at 481. The third judge dissented, concluding that the award was "far beyond that which a reasonable trier of fact would assess." Id. at. 482.
[6] The court also denied plaintiffs' certiorari application. 96-0435 (La.4/26/96); 672 So.2d 677.
[7] The court of appeal listed the following pre-existing conditions at the time of Ms. Boutte's admission:

1. congestive heart failure with acute pulmonary edema;
2. hypertrophy cardiomyopathy;
3. pulmonary fibrosis or scarring of the lungs resulting from the lungs inability to expand sufficiently so as to allow her to breathe properly;
4. atrial tachycardia;
5. hyponatremia;
6. anemia;
7. peripheral vascular disease which caused gangrenous non-healing ulcers on her extremities because her heart was too weak to pump blood to the extremities;
8. arrhythmia or irregular heart beats;
9. mitral regurgitation and aortic insufficiency in which her dysfunctional heart valve, located between the two chambers of the heart allowed blood to leak back into the lungs, also causing congestion;
10. an aortic aneurysm or bulging of the largest blood vessel which required surgery, but surgery was contraindicated because her heart could not tolerate the stress.
[8] The mortuary director testified that Ms. Boutte attended meetings regularly before her fall, but never attended meetings thereafter.
[9] Plaintiffs introduced Christmas photographs of Ms. Boutte in a wheelchair to support their claim that she was not mobile enough to move around after the hip surgery.