706 So.2d 676 (1998)
Robert DEKEYSER
v.
AUTOMOTIVE CASUALTY INSURANCE COMPANY, John Finchbeiner, Jr., Grace Ann Kelly, ABC Insurance Company, State Farm Mutual Automotive Insurance Company, Joyce Nicholson and Farmers Insurance Company of Arizona.
No. 97-CA-1251.
Court of Appeal of Louisiana, Fourth Circuit.
February 4, 1998.
Rehearing Denied March 16, 1998.
*678 Russ M. Herman, Steven J. Lane, Herman, Herman, Katz & Cotlar, New Orleans, for Plaintiff/Appellant Robert Dekeyser.
James Ryan, III, Peter S. Title, Sessions & Fishman, L.L.P., New Orleans, for Defendant/Appellee State Farm Mutual Automobile Insurance Company.
Before ARMSTRONG, PLOTKIN and WALTZER, JJ.
WALTZER, Judge.

I. STATEMENT OF FACTS
On 11 February 1991, at approximately 1 o'clock in the morning, a vehicle driven by Lori Palmour Pacaccio (a Louisiana resident) and owned by her mother, Joyce Nicholson (a Louisiana resident), stalled on its approach to the Mississippi River bridge on U.S. 90B in New Orleans, Louisiana. Next, a vehicle owned and driven by an Arizona resident, Cynthia Kuneman, and occupied by another Arizona resident, Robert Dekeyser, stopped behind Nicholson's vehicle. State Farm Mutual Automobile Insurance Company (State Farm) insured, for both liability and uninsured/underinsured coverage, Ms. Kuneman and her vehicle. Finally, a third vehicle, driven by Grace Ann Kelly (a resident of California) and owned by John Finchbeiner, a resident of Louisiana, approached the stopped vehicles and collided with Kuneman's vehicle pushing Kuneman's car into Nicholson's car. Ms. Kelly carried insurance with Allstate Insurance Company (Allstate). This three vehicle collision injured several people, including plaintiff-appellant, Robert Dekeyser (Dekeyser). Dekeyser treated for both a compressed cervical fracture of the seventh vertebra in Louisiana and Arizona and debilitating emotional problems resulting from the accident. Immediately after the accident, an ambulance transported plaintiff to Jo Ellen Smith Hospital where the emergency room staff diagnosed the fracture. Several hours after the accident, plaintiff transferred to Meadowcrest Hospital, and Dr. Frank Culicchia, a neuro surgeon, treated plaintiff for the fracture. Plaintiff left Louisiana a few days after the accident and continued treatment for the fracture with Dr. Thomas Norton, a neuro surgeon. Eventually, plaintiff sought treatment for depression and other emotional problems associated with the accident from both his doctor and a licensed clinical social worker. Dekeyser's *679 physical and emotional problems improved markedly with time and effort.

II. STATEMENT OF THE CASE
Dekeyser filed a Petition for Damages on 7 June 1991. Defendants included John Finchbeiner, Jr., Automotive Casualty Insurance Company, Grace Ann Kelly, Allstate Insurance Company (added by amending petition), State Farm Mutual Automobile Insurance Company, Joyce Nicholson, and Farmers Insurance Company of Arizona. Dekeyser alleged the combined negligence of Kelly, Finchbeiner and Nicholson caused his injuries/damages.
The court conducted a four day jury trial in May, 1996. The jury returned a verdict, assessing 62% of the fault to Kelly and 38% of the fault to Finchbeiner. The jury found Kelly "liable for punitive damages". The jury awarded damages in the amounts of $500,000.00 (general), $45,060.57 (special), and $850,000.00 (punitive). On 22 May 1996, the court rendered judgment for Dekeyser and against Allstate and Farmers Insurance company of Arizona for the limits of the insureds' policies plus interest from judicial demand on the amount of the policy limits. Furthermore, the court rendered judgment, "in favor of Robert Dekeyser and against State Farm Mutual Automobile Insurance Company as the U.M. carrier of Cynthia Kuneman in the sum of $25,000.00 with interest from judicial demand on the entire amount of $1,187,937.52." State Farm filed a Motion for J.N.O.V., Remittitur, and/or New Trial. On 13 September 1996, the trial judge heard this Motion. On 28 October 1996, the court granted State Farm's Motion for New Trial, in part, and amended the 22 May 1996, Judgment. Thus, the Judgment rendered in the case now provides, in pertinent part; "Judgment is rendered in favor of Robert Dekeyser and against State Farm Mutual Automobile Insurance Company as the uninsured/underinsured motorist carrier of Cynthia Kuneman in the sum of $25,000.00 with interest thereon from date of judicial demand." Otherwise, all post-trial requests for relief from the 22 May 1996, Judgment were denied by the court. On 31 July 1996, Dekeyser filed into the record a Satisfaction of Judgment reflecting Allstate's complete payment of the Judgment rendered against it.
Both Dekeyser and State Farm filed notices of devolutive appeal, respectively in November and December, 1996. Plaintiff alleges the court erred in amending the 22 May 1996, Judgment limiting State Farm's interest obligation to policy limits. On appeal, State Farm contends the jury wrongly imposed punitive damages against Kelly and/or excessively awarded punitive damages, special damages, and general damages. On 30 May 1997, State Farm by Ex Parte Motion to Tender Judgment tendered $37,936.82, the amount representing the sum of the judgment against State Farm in favor of plaintiff plus interest on the amount owed until the date deposited into the registry of the court. By Motion to Withdraw Funds from the Registry of the Court, plaintiff received payment of the Judgment rendered in his favor and against State Farm.
III. FIRST ASSIGNMENT OF ERROR: Plaintiff contends the trial court erred when the court granted State Farm's Motion For New Trial and amended the original judgment to limit the insurer's obligation for legal interest.
Dekeyser argues on appeal the trial court erred in granting State Farm's Motion for New Trial, in part, amending the 22 May 1996, judgment and changing the amount determinative of the insurer's liability for interest from the total of the "entire judgment of $1,187,937.52", to the limit of the insurer's coverage under the policy, $25,000.00. Plaintiff argues that State Farm owes interest on the total of the judgment from judicial demand. In support of his position, Dekeyser relies upon Louisiana law.
State Farm argues for application of Arizona law, but La.R.S. 22:1406(D)(1)(a)(iii) provides "the requirement for uninsured motorist coverage shall apply to any liability insurance covering any accident which occurs in this state and involves a resident of this state." (Emphasis supplied.) The statute became effective on 1 September 1987. State Farm issued the insurance policy, governing the instant controversy, on 7 August 1989. The accident injuring Dekeyser occurred on 11 February 1991, and Dekeyser *680 filed suit on 7 June 1991. Neither State Farm nor Dekeyser dispute that plaintiff's cause of action arose well after the effective date of LSA-R.S. 22:1406(D)(1)(a)(iii). Moreover, Dekeyser's claims unquestionably arose from an accident occurring in the State of Louisiana and involved several Louisiana residents. Because a specific choice of law rule requires the application of Louisiana law to the plaintiff's substantive claims for underinsured motorists benefits from State Farm, Louisiana law applies to determine State Farm's interest obligation. Williams v. Petroleum Helicopters, Inc., 234 So.2d 522, 524 (La.App. 3 Cir.1970), cert. denied 256 La. 371, 236 So.2d 501 (1970).
State Farm argues for application of Arizona law in a "multi-party" accident, "even though one of the injured parties is a Louisiana resident and the accident occurs in Louisiana,". Basically, State Farm relies on three cases for its argument. Specifically, State Farm urges the Court to follow its prior decision and apply another state's substantive law. In Levy v. Jackson, 91-C-2424 (La.App. 4 Cir. 1/14/93), 612 So.2d 894, 896, the Court applied Alabama law, concluding that the substantive law of another state controlled the determination of the only issue on appeal, whether a guest passenger may sue the driver and the driver's insurer for ordinary negligence. The Court states, "In other words, the choice of law question arises because this court must decide whether summary judgment was appropriate as to liability." Levy, supra at 895. First, Levy concerns issues of liability only. In Levy, the plaintiffs alleged insufficient liability coverage, but on appeal, the court was not presented any issue of uninsured/underinsured motorists coverage. Second, the Court's reasoning included application of the new Civil Code articles, codifying the general rules of conflict of laws. The new Conflict of Law provisions were codified by the 1991 Louisiana Legislature as "Book IV" of the Louisiana Civil Code. The Legislature clearly expressed its intention that the new provisions apply prospectively only, as demonstrated by the following quote from the legislative act, adopting the new law:
This Act shall become effective on January 1, 1992, and shall apply to all actions filed after that date.
Acts 1991, No. 923, Sec. 4. Thus, Levy may be further distinguished from the case before the court, because the rules of Book IV could not be applied to the facts of this suit, as these provisions apply prospectively only.
Finally, at the same time that Book IV was adopted, the Legislature also adopted LSA-C.C. art. 14, codifying the general rule, as follows:
Unless expressly provided by the law of this state, cases having contact with other states are governed by the law selected in accordance with the provisions of Book IV of this Code.
Acts 1991, No. 923, Sec. 1. In Symeonides, Symeon C., "Louisiana Conflicts Law: Two `Surprises'," 54 Tul L.Rev. 497 (1994), the author explains the impact of LSA-C.C. art. 14, effective 1 January 1992, as follows:
Article 14 establishes the residual character of Book IV vis-a-vis other more specific provisions of Louisiana legislation. Book IV is not intended to supersede more specific conflicts rules contained in other Louisiana statutes, such as those found in the Insurance Code,... When applicable, those rules, being more specific, will prevail over the provisions of Book IV of the Civil Code.
LSA-R.S 22:1406(D)(1)(a)(iii) provides a specific rule governing the question of underinsured motorists insurance coverage in Dekeyser's case. Therefore, the specific rule controls the conflict of laws issue, irrespective of whether the Court considers the general rules of Book IV or the general rules controlling conflict of laws issues existing in Louisiana before the legislature's codification of the rules with Book IV.
Reviewing a trial court's determinations of the legal interest obligation, the appellate court must determine whether the trial court abused its discretion in granting or denying the motion for new trial. Zatarain v. WDSU-Television, Inc., 95-2600 (La. App. 4 Cir. 4/24/96), 673 So.2d 1181, 1183. We are unable to determine from the record the trial judge's reasons for altering the *681 amount, on which State Farm owes interest, from $1,187,937,52 (the entire judgment), to $25,000.00 ( State Farm's policy limits). To disturb a trial court's factual findings on motion for new trial, an appellate court must determine from the record that the findings are clearly erroneous. Turner v. Dameron-Pierson Company, Ltd., 95-0143 (La.App. 4 Cir. 11/16/95), 664 So.2d 739, 741.
Generally, judgments in ex delicto cases bear legal interest from the date of judicial demand until paid. La.R.S.13:4203. Liability and UM/UIM insurers owe interest on their policy limits from the date of judicial demand. Martin v. Champion Ins. Co., 95-0030 (La.6/30/95); 656 So.2d 991, 995; citing Ainsworth v. Government Employees Insurance Company, 433 So.2d 709 (La.1983). Therefore, State Farm's statutory obligation requires it to pay legal interest on its policy limits, $25,000.00, from the date of judicial demand, until paid.
Dekeyser argues State Farm also owes, in addition to its statutory obligation, interest on the amount of the damages awarded in excess of the policy limits, under the terms of the insurance policy issued by State Farm to Cynthia Kuneman. Interpretation of all of the provisions, including the provisions relating to the obligations of a liability insurer, of the insurance policy determine the uninsured/underinsured motorist insurer's interest obligation on judgments exceeding policy limits. Martin, supra, 656 So.2d at 998. Any provision of an insurance policy enhancing liability coverage and benefiting the insured must enhance the UM/ UIM coverage and benefit the insured. Martin, supra at 994. La.R.S. 13:4203 does not prohibit insurers, including UM/UIM insurers, from lowering, excluding or extending their interest liability on amounts in excess of their policy limits, with their policy. Martin, supra at 995.
State Farm's policy, issued to Cynthia Kuneman and effective on the date of the accident, contains both a supplemental payment provision and an endorsement.[1] Plaintiff argues for resort only to the supplemental payment provision to determine the rights and obligations of the parties. This provision declares, in pertinent part:
In addition to the limits of liability, we will pay for an insured any costs listed below resulting from such accident....2. Interest on all damages owed by an insured as the result of a judgment until we pay, offer, or deposit in court the amount due under this coverage.
In Martin v. Champion Ins. Co., 95-0030 (La.6/30/95); 656 So.2d 991, 995, the Supreme Court interpreted an identical policy provision and held that the policy required the insurer pay interest on damages in excess of policy limits from date of judicial demand. However, endorsement 6994BB of the Kuneman policy provides:
1. LIABILITY COVERAGE
a. Item 2 under "In addition to the limits of liability, we will pay for an insured any costs listed below resulting from such accident," is changed to read:
2. Interest on damages owed by the insured due to a judgment and accruing:
a. after the judgment, and until we pay, offer, or deposit in court, the amount due under this coverage; or
b. before the judgment, where owed by law, but only on that part of the judgment we pay.
An endorsement prevails when a conflict arises between the endorsement and the main body of an insurance contract. Howell v. American Casualty Co. of Reading, Pennsylvania, No. 96-0694 (La.App. 4 Cir. 3/19/97), 691 So.2d 715, 724. Endorsement 6994BB changes Kuneman's policy.
The policy conforms with an insurer's statutory obligations, concerning legal interest, under Louisiana law. Under La. R.S. 13:4203, all insurers owe interest on their policy limits from the date of judicial demand until paid. Martin, supra, 656 So.2d at 995. *682 Neither Dekeyser nor State Farm contests the insurer's statutory obligation under Louisiana law. The Endorsement uses "or" between Sections a and b. Dekeyser argues the Endorsement gives State Farm an option to pay either pre-judgment or post-judgment interest. Dekeyser seeks to have the Endorsement declared null and void because State Farm's policy creates an option. Moreover, Dekeyser seeks to have State Farm's interest obligation determined under the "supplemental payment provision". The policy language, including the word "or" between the two phrases modifying "accruing", does not create an invalid option to pay prejudgment "or" post-judgment interest. Interpreting the Endorsement against the insurer, the most reasonable reading of the Endorsement obligates State Farm to pay both pre-judgment and post-judgment interest.
The pertinant language appears unclear and ambiguous. Fletcher v. Leader National Ins. Co., 513 So.2d 1226, 1228 (La.App. 4 Cir.1987). The provisions of Endorsement 6994BB of the Kuneman policy are susceptible to various reasonable interpretations, the rules of interpretation require this Court to choose the interpretation favoring coverage. Kiefer v. Southern Freightways, Inc., 95-2037, 95-2038 (La.App. 4 Cir. 12/27/96), 686 So.2d 1041, 1045-1046. Many questions arose concerning the meaning of phrases used in the controlling Endorsement. For example, what is the difference between "damages owed by the insured due to a judgment and accruing" in the general provision, "the amount due under this coverage" in Sec. a, and "that part of the judgment we pay" in Sec. b? Moreover, analysis is complicated by the language of the general "supplemental payment provision" which simply binds State Farm to pay "[i]nterest on all damages owed by an insured as a result of a judgment until we pay, offer, or deposit the amount due under this coverage." How did the endorsement change State Farm's Liability for interest? Did the endorsement change State Farm's liability for interest?
First, the court must determine the effect of the phrase "damages owed by the insured due to a judgment and accruing". Because Dekeyser's claim against State Farm involves UM/UIM coverage, the "insured" owes no damages. The Supreme Court addressed a similar situation, in Martin, supra at 994, In Martin, the Court stated:
Application of a supplemental payment provision to a UM claim arises under La. R.S. 22:1406 and not by virtue of contract. The fact that a provision would not, by its literal terms, apply to the UM claim is irrelevant. When a supplemental payment provision requires payment of interest in a liability suit, La. R.S. 22:1406 requires that such interest also be paid in a suit by an insured under its UM coverage. To hold otherwise, would effectively reduce the amount of UM coverage below the liability coverage in direct contravention of the express mandate of La. R.S. 22:1406. Thus, despite the use of the word "insured" in the quoted provision, we conclude that according to La. R.S. 22:1406, the interest benefit provided for in the liability context, must also be provided in the UM contract.
Id.
The obvious difference between the general supplemental payment provision and the Endorsement is State Farm's attempt to differentiate its liability for pre-judgment interest and its liability for post-judgment interest. Section b of the Endorsement explains State Farm's obligation to pay pre-judgment interest "that part of the judgment we pay." State Farm obligated itself to pay pre-judgment interest on the amount paid by the insurance company up to the policy limits, $25,000.00. Section a limits State Farm's liability for post-judgment interest to "the amount due under this coverage,". The phrase may refer to the policy limits or to the "damages owed by the insured due to judgment and accruing". In Martin, supra at 1000, the Supreme Court interpreted a similar provision to require payment of interest on the entire judgment.
Extending its statutory obligation for legal interest, the insurer bound itself to pay interest, accruing after the judgment, on, "damages owed" (the entire judgment). This obligation accrued with the original judgment on 22 May 1996. The judgment of 22 May 1996, determined State Farm's liability. Ferrell v. *683 Fireman's Fund Ins. Co., 92-2116 (La.App. 4 Cir. 10/7/96), 680 So.2d 690, 700. Because the trial judge assessed State Farm's liability with the original judgment and further amended this obligation with the 28 October 1996 judgment, the date of the original judgment, 22 May 1996, correctly marks the accrual of State Farm's interest obligation on the excess judgment.
State Farm argues its interest obligation terminated when it deposited its policy limits plus interest on its policy limits from the date of judicial demand until the date tendered, on 30 May 1997. The supplemented record establishes that the insurer tendered $37,936.82, its policy limits plus interest thereon from judicial demand until tendered. An insurer's policy determines whether its obligation to pay interest on an excess judgment terminates when it deposits its policy limits plus interest thereon from judicial demand until tendered. Ferrell v. Fireman's Fund Ins. Co., 92-2116 (La.App. 4 Cir. 10/7/96), 680 So.2d 690, 698; reversed on other grounds, 96-3028 (La.7/1/97), 696 So.2d 569, 577. State Farm agreed to pay interest on an excess judgment until, "we pay, offer, or deposit in court, the amount due under this coverage". (Emphasis supplied). Language identical to Kuneman's policy language was previously interpreted by this Court, and the Court held that this language obligated the insurer to pay interest on the excess judgment until it paid the policy limits. Runnels v. Esteves, 550 So.2d 1225, 1227 (La.App. 4 Cir.1989). Because State Farm tendered its policy limits plus interest on its limits, the insurer's contractual obligation terminated with the tender on 30 May 1997.
State Farm contends that its liability for interest on the excess judgment should be reduced by Allstate's payment on 31 July 1996, of the judgment against it. Martin, supra, 656 So.2d at 999. The record establishes that Allstate satisfied the judgment rendered against it. Furthermore, the record establishes that Allstate insured Grace Kelly, the tortfeasor, and that Kelly's coverage primed State Farm's coverage. State Farm correctly argues for a credit for the amount paid by Grace Kelly's insurer, Allstate.
Therefore, the record on appeal clearly establishes that State Farm obligated itself to pay interest on its policy limits, $25,000.00, from judicial demand until paid on 30 May 1996 and to pay interest on the entire judgment ($1,087,937.52this sum representing the total amount of the judgment of $1,187,937.52 less a credit for the $100,000.00, paid by Allstate), from the date of the original judgment, 22 May 1996, until deposited into the registry of the court, on 30 May 1997.
IV. SECOND ASSIGNMENT OF ERROR: State Farm contends the jury's award of exemplary damages under LSA-C.C. art. 2315.4 was "clearly wrong" or "manifestly erroneous".
On 27 December 1996, State Farm filed a Motion and Order of Devolutive Appeal. Dekeyser argues State Farm acquiesced in the judgment by tendering the amount owed on 30 May 1997, and therefore, LSA-C.C.P. art.2085 precludes the insurer from appealing. However, plaintiff has failed to offer any evidence, other than the tender of the amount owed under a judgment rendered against State Farm after noticing its intent to devolutively appeal the judgment, to establish a voluntary and unconditional acquiescence in the judgment by State Farm. LSA-C.C.P. art.2085; Brewster v. Santos, 94-1148 (La.App. 4 Cir. 11/30/94), 646 So.2d 486, 488. Therefore, plaintiff failed to prove State Farm's acquiescence in the judgment.
Having fully addressed State Farm's arguments about its interest obligation, the court must consider the insurer's additional arguments concerning the jury's fact determinations. Specifically, State Farm argues the jury erred with the imposition of punitive damages under LSA-C.C. art. 2315.4, in assessing the amount of punitive damages ($850,000.00), by awarding $500,000.00 in general damages, and in awarding the amount of special damages ($30,00.00-lost wages and lost earning capacity and $15,060.57-medical expenses).[2]
*684 Until an appellate court determines that a fact-finder's conclusions are "clearly wrong" or "manifestly erroneous", the court should not redetermine the facts de novo from the record and render a judgment on the merits. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745 (La.1995). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be "manifestly erroneous" or "clearly wrong". Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 972 (La.1985). When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of the jury. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). Where a jury's findings are based on its decision to credit the testimony of certain witnesses, the findings can virtually never be manifestly erroneous or clearly wrong. Id. We are instructed that before a jury's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict and that the record establishes that the verdict is manifestly erroneous. Lewis v. State Through DOTD, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through DOTD, 92-1328 (La.4/12/93); 617 So.2d 880, 882-883.
The jury awarded punitive damages to Dekeyser from Grace Kelly under LSA-C. C. art. 2315.4, and State Farm argues the evidence did not support this award. In reviewing the factual findings of a jury on appeal, a determination of "manifest error" limits the role of the appellate court. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), 666 So.2d 612, 614-615. To recover exemplary damages, Dekeyser must prove, by a preponderance of the evidence, three elements, including; (1) intoxication, (2) wanton and reckless disregard, and (3) cause-in-fact between the intoxication and the damages. LSA-C.C. art. 2315.4.
State Farm argues Dekeyser failed to present sufficient evidence to support the jury's finding of the three elements. Several witnesses testified about Ms. Kelly's appearance and condition immediately after the accident. From one disinterested and independent witness (Anthony Paul), the jury heard that Kelly smelled strongly of alcohol, admitted she didn't see the Dekeyser car, spoke nervously, and appeared upset. Furthermore, several witnesses testified Ms. Kelly slurred her speech and appeared unconcerned or disinterested. Moreover, numerous witnesses corroborated Mr. Paul's testimony that both Mr. Finchbeiner and Ms. Kelly smelled of alcohol. Even though Ms. Kelly testified she took and passed a field sobriety test at the scene of the accident, the jury also heard testimony from witnesses at the scene that no test was administered to Ms. Kelly. Finally, Ms Kelly testified she had consumed alcohol before the accident.
Grace Kelly testified she didn't see the Dekeyser vehicle because a truck blocked her view. She admitted to Mr. Paul on the night of the accident at the scene she hadn't seen the Dekeyser vehicle. Mr. Paul testified he watched the Kelly vehicle and didn't see a car or truck in the left lane in front of the Kelly car. Mr. Paul also testified he saw the impact. Ms. Kelly claims she attempted to avoid colliding with Dekeyser's car, but numerous witnesses testified they neither saw nor heard any evidence of Ms. Kelly's claims. Many witnesses also testified that other vehicles had easily avoided the stalled/ stopped cars.
Kelly further testified she enjoyed the festivities associated with Mardi Gras from early in the morning of 10 February 1991, until just before the accident. Ms. Kelly testified she had consumed an uncorroborated and undetermined amount of alcohol prior to driving Mr. Finchbeiner's car.
Mr. Paul testified that the hazard lights on the rear of the Dekeyser vehicle were operating when Ms. Kelly rear-ended the stopped vehicle pushing it into the stalled vehicle. Moreover, Mr. Paul and other witnesses testified that the weather was clear and dry before the accident and the lighting was good. However, Ms. Kelly testified she did *685 not see the stalled/stopped vehicles and could not avoid the collision.
This Court finds no error in the jury's determination that Ms. Kelly drove intoxicated on the night of the accident and her intoxication was a cause-in-fact of Dekeyser's injuries. Furthermore, the court finds no error in the jury's conclusion that Kelly's actions, failing to slow, stop or otherwise avoid the obstruction of the stalled and stopped cars on this clear night on a well-lit, often-travelled, and multi-lane roadway indicated her "wanton and reckless disregard for the rights and safety of others."
The jury believed that Grace Kelly's slurred speech and other unusual behavior and admission of consuming alcohol at the Mardi Gras celebrations on the day of the accident evidenced her intoxication, that this intoxication caused her to drive into the rear of a stopped car, and that her behavior amounted to "wanton and reckless disregard". The jury heard plaintiff's witnesses' descriptions of Kelly's behavior and the collision and Kelly's description of her behavior and the accident, and the jury believed the plaintiff's witnesses' accounts. The jury also heard from Kelly, without any corroboration from her co-defendant, John Finchbeiner, her self-serving and unsubstantiated testimony about passing a field sobriety test at the scene. However, other witnesses testified that they did not see the administration of any field sobriety test, and the jury chose to believe the testimony of these witnesses. Our review of the record in its entirety convinces us that the jury's findings are reasonable in light of the record.
V. THIRD ASSIGNMENT OF ERROR: State Farm contends the jury abused its discretion and awarded excessive amounts of general and exemplary damages.
Reviewing a jury's award of damages, an appellate court must determine whether the jury abused its "much discretion" in awarding Mr. Dekeyser $500,00.00 for general damages. La. C.C. art.1999. Reviewing general damage awards requires the appellate court to determine whether the award, for the particular injuries and their effects under the particular circumstances on the particular injured person, clearly abuses the discretion of the fact-finder. Merritt v. Karcioglu, 96-0431 (La.2/25/97), 687 So.2d 1002, 1004; citing Youn v. Maritime Overseas Corp., 92-3017 (La.9/3/93), 623 So.2d 1257, 1260-1261. A determination of an abuse of discretion is necessary before a result to prior awards is appropriate. Id. Because the parties do not contest Mr. Dekeyser suffered certain injuries from the collision, the entire record must be reviewed to determine the nature and extent of his injuries. Merritt, supra, 687 So.2d at 1004. Clearly, Mr. Dekeyser suffered injury, both physical and emotional, caused by the accident on 11 February 1991. Several witnesses testified he left the scene by ambulance, and he was treated initially at the emergency room at Jo Ellen Smith Memorial Hospital. Diagnostic tests revealed his complaints of neck pain stemmed from a burst fracture to the seventh cervical vertebra. Eventually, Mr. Dekeyser transferred to Meadowcrest Hospital for treatment on 11 February 1991. At Meadowcrest, Dr. Frank Culicchia, neurological surgeon, treated plaintiff and agreed with the diagnosis. Dr. Culicchia testified he offered his patient a choice of treatments for the fracture, either surgery or the halo vest. Mr. Dekeyser chose the halo vest, which treatment requires four pins screwed into the skull attached externally to a vest used to hold the head immobile. Dr. Culicchia further testified he performed the thirty to forty minute procedure and fitted Mr. Dekeyser with the halo vest. With a thorough neurological examination, Dr. Culicchia determined Dekeyser suffered no neurological injury. After a few days, Robert Dekeyser left New Orleans and returned to Arizona. On 16 February 1991, he began treatment with a neurological surgeon, Dr. Thomas Norton, in Arizona. Dr. Norton reviewed the tests from the Louisiana hospitals, performed further diagnostic tests, including a neurological examination, and agreed with the diagnosis, a fracture to the seventh cervical vertebra. Both Dr. Culicchia and Dr. Norton testified that the accident of 11 February 1991 caused the fracture.
Dr. Norton saw Mr. Dekeyser on six occasions, from 16 February 1991, until 14 *686 May 1991. In late April or early May the halo vest was removed, and Mr. Dekeyser wore a Philadelphia collar, a plastic support for his neck, for a few weeks. On 14 May 1991, Dr. Norton performed numerous diagnostic tests, examined the plaintiff and believed Mr. Dekeyser's injury had healed to the extent possible. Therefore, plaintiff suffered severe physical injury in the accident, endured the necessary treatment for this injury, and healed to the extent medically possible.
Moreover, the plaintiff complained of and sought treatment for certain emotional problems associated with the accident. Ms. Ann Fisher, a clinical social worker, testified she first saw Dekeyser on 24 June 1991, for sleep disturbance and depression-like symptoms which he associated with the accident. She also testified she believed Dekeyser's emotional problems resulted from the accident. However, she also believed Mr. Dekeyser's particular situation, his parent's divorce at a vulnerable age for Robert Dekeyser and his father's abuse and alcoholism, encouraged the plaintiff's unusual susceptibility to the emotional upheaval endured by him after this accident and the resulting physical injury, a broken neck. Furthermore, Ms. Fisher testified she recommended plaintiff seek psychiatric treatment for the stress disorders and emotional problems which Ms. Fisher associated with the accident and the resulting physical trauma. Finally, Ms. Fisher met with Mr. Dekeyser approximately seventeen times from 24 June 1991, until October 1992, she saw marked improvement, but she testified she believed he continued to need "on-going and intermittent" treatment.
Plaintiff also introduced the testimony of a psychiatrist, Dr. Ronald David. Dr. David examined and evaluated plaintiff. Dr. David determined plaintiff experienced post traumatic stress disorder associated with the accident and recommended plaintiff pursue treatment.
Robert Dekeyser and his mother testified about the plaintiff's damages at the trial. The son described the intense pain in his neck which he endured after the accident, the feelings of isolation and depression surrounding his treatment in a place where he had no family or friends, the understandable fears associated with learning he broke his neck, the torturous sensation of four pins screwed and tightened into his skull, his inability to pursue most routine activities (driving, socializing, exercising, bathing, working), his embarrassment, and his dependence upon other people. Mr. Dekeyser further testified, after the accident, he lost independence from his parents which he valued and needed and has not regained since the accident. Plaintiff testified he continues to experience pain from the neck injury and experiences some emotional problems associated with the collision.
Plaintiff's mother testified she believed plaintiff suffered greatly after the accident. First, she described the pain associated with the broken neck and the halo vest. Second, she remembered the nightmares and tremors suffered by her son after the accident. Finally, she testified her son appeared to withdraw from his friends and his family and his former life following the accident.
From the record, we cannot say that the jury's award of $500,000.00 in general damages to Robert Dekeyser for a broken neck, "shocks the conscience." Ruiz v. Oniate, 96-2211 (La.App. 4 Cir. 8/6/97), 697 So.2d 1373, 1385; citing Moore v. Healthcare Elmwood, Inc., 91-41 (La.App. 5 Cir. 6/5/91), 582 So.2d 871, 879. The award is not obviously the result of passion or prejudice, and it bears a reasonable relationship to the elements of the proved damages. Youn, supra, 623 So.2d at 1260-1261. Many rational triers of fact could have decided that a lower award is more appropriate, but we can not conclude from the entirety of the evidence, viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the award of general damages at the level set by the jury or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Youn, supra at 1260-1261. Mr. Dekeyser broke his neck in an accident caused by defendants. After the accident, plaintiff, a very impressionable and extremely independent twenty year old, received painful and extremely invasive medical treatment for his injuries in a strange city and state with virtually no support. For *687 months after the collision, plaintiff wore the surgically implanted and externally visible and detrimentally obtuse halo vest. The injury caused him pain, embarrassment, and discomfort. Moreover, plaintiff suffered numerous emotional disturbances, including nightmares, night tremors, depression, isolation, fear, anxiety, and anger. Plaintiff presented enough evidence from which the jury could have determined that the plaintiff suffered post traumatic stress disorder. Even though the plaintiff has showed remarkable recovery, he testified at trial he still experiences pain and discomfort both physically and mentally. Thus, the jury's award of $500,000.00 in general damages was not an abuse of the jury's "much discretion".
State Farm argues the $850,000.00 award against Grace Kelly for exemplary damages under LSA-C.C. art. 2315.4 grossly exceeded a reasonable sum. Many factors may be considered when determining the amount of a reasonable award of punitive damages, including "the defendant, the defendant's conduct, the magnitude of the potential harm arising from it, and even the defendant's net worth, to assess the probability of deterrence." Laris v. Parker, 92-1443 (La.App. 4 Cir. 3/29/94); 635 So.2d 442, 444. Visiting Louisiana for the Mardi Gras celebrations, Grace Kelly decided to drink and drive to continue the fun and festivities. Kelly's actions caused severe injury to plaintiff. Potentially, Ms. Kelly's actions could have caused serious injury or death for many people. Reasonable minds could differ on the appropriate amount to award to "exemplify the wrongful conduct of the defendant". Id. The award of $850,000.00 did not abuse the discretion of the jury.
ACCORDINGLY, the 28 October 1996, Judgment awarding $25,000.00 plus interest on that amount, in favor of plaintiff, Robert Dekeyser, and against State Farm, is affirmed and amended to reflect the insurer's contractual obligation to pay interest on the entire award, less the payment of $100,000.00 by Allstate, from the date of the original judgment, 22 May 1996, until the date State Farm deposited in court its policy limits plus interest thereon, 30 May 1997. Furthermore, the jury's award of damages, including exemplary, general and special, is affirmed.
AFFIRMED AND AMENDED.
PLOTKIN, J., concurs with written reasons.
PLOTKIN, Judge, concurring with written reasons.
I agree with the majority's result on all issues presented by this appeal. However, I write separately to more thoroughly address a question raised by the punitive damage issue.
My primary concern on the punitive damages issue is not whether the trial court properly awarded punitive damages, but whether the punitive damage award of $850,000 was appropriate under the relevant law. My primary concern related to the majority's analysis is the failure to consider the principles for determining the amount of a punitive damage awards established by the United States Supreme Court's decision in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), as interpreted on remand by the Alabama Supreme Court in BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997).
The United States Supreme Court's decision finding that the $2 million punitive damage award imposed on BMW of North America was "grossly excessive" under the facts of the case was based on its concern that the award violated the Due Process Clause of the Fourteenth Amendment of the United State Constitution. That issue has not been raised by the parties in the instant case; State Farm's primary argument concerning the punitive damage award is that it is "grossly excessive" because it is more than 150 percent of the general damage award.
In BMW of North America, the United State Supreme Court established three "guideposts" for determining whether a punitive damage award is constitutionally excessive: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between the plaintiff's award of compensatory damages and the amount of the punitive damages; and (3) the difference between the punitive damages award and the civil or *688 criminal sanctions that could be imposed for comparable misconduct. 517 U.S. at 575-576, 116 S.Ct. at 1599. I would note that State Farm's argument in the instant case raises only the second of those factors, while the majority's opinion considers only the first. Moreover, the Alabama Supreme Court's application of the second factor in BMW of North America, 701 So.2d 507 (1997) indicates that the 150 percent ratio present here might be insignificant depending on other factors; the punitive damage award imposed by the Alabama Supreme Court was $50,000, more than 10 times the amount of the $4,000 general damage award in that case.
My concern that the $850,000 punitive damage award in the instant case is "grossly excessive" notwithstanding, the fact is that State Farm failed to raise a constitutional challenge to the award. Moreover, the record contains insufficient evidence to allow this court to determine whether the punitive damage award in this case would have been "grossly excessive" under the standards established by the United States Supreme Court in BMW of North America. Accordingly, I concur in the majority's affirmation of the trial court's $850,000 punitive damage award.
NOTES
[1] Neither Dekeyser nor State Farm contends that both the supplemental payment provision and the endorsements are incorrectly considered part of State Farm's insurance policy issued to Cynthia Kuneman and effective on the day of the accident.
[2] Absent some argument demonstrating that the jury abused its discretion awarding the special damages, the court need not address this conclusion in State Farm's brief. The record establishes that plaintiff suffered certain losses associated with both loss of earnings and medical expenses. Therefore, the record does not support State Farm's conclusions.