735 So.2d 696 (1999)
James LILLEY, et al., Plaintiffs Appellees,
v.
BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY and Agricultural and Mechanical College, et al., DefendantsAppellants.
No. 98-1277.
Court of Appeal of Louisiana, Third Circuit.
March 24, 1999.
Writ Denied June 4, 1999.
*697 R. Stuart Wright, Natchitoches, for Plaintiff Appellee James Lilley et al.
Jack O. Brittain, Natchitoches, for Defendant Appellant Board of Supervisors of LSU, et al.
Robert Lyle Salim, Natchitoches, for Plaintiff Appellee James Bloodworth.
Before SAUNDERS, AMY and PICKETT, Judges.
AMY, Judge.
The plaintiffs were awarded compensatory damages as well as medical monitoring expenses due to their alleged exposure to asbestos on the defendant's property. The defendant appeals. For the following reasons, we affirm in part, reverse in part.

*698 Factual and Procedural Background
The plaintiffs in this consolidated matter[1] are firefighters, of varying job description and rank, of the City of Natchitoches, Louisiana. Each of the plaintiffs allege that they have suffered damage due to exposure to asbestos contained within the "Old Dairy Barn" located in Natchitoches. The record reveals that this property, on the campus of Northwestern State University, was designated for use as a training facility by the Louisiana State University Firemen Training Program. The plaintiffs maintain that they were permitted to have contact with the building despite knowledge of LSU personnel that the building contained asbestos-bearing material.
The events now at issue arose during LSU's preparation of the barn as a training facility in the summer of 1991. Testimony contained in the record indicates that in July 1991, several LSU employees, including supervisor James Hebert, traveled to the barn and began making preparations. According to Stan Babin, a teaching associate and coordinator with the program, he discovered material appearing to be asbestos while working in the barn. He stated that he informed James Hebert of this discovery and that, after discussion, Hebert left the premises. James Hebert testified that he did not know that asbestos was dangerous, but that he contacted his superior, Thomas Hebert, due to the concern over the presence of the substance. He stated that he was instructed to send his men home, which he did, and inform NSU personnel. James Hebert testified that, ultimately, he was ordered to leave the ceiling intact, an area allegedly containing asbestos, and cover it with plywood.
A group of men, including James Hebert, returned to the barn on August 5, 1991. Hebert stated that, on this day, he brought plywood with him and intended to cover the ceiling as instructed. The record reflects that, in addition to the LSU personnel working in the barn that day, members of the Natchitoches Fire Department were also working in the barn. These men had volunteered their off-duty time to assist in the preparation of the barn. While attempting to burn the paint from the wall in Room 105, a fire began and the Natchitoches Fire Department was summoned. Members of both the NFD and Natchitoches Fire Protection, District 6 responded. The fire was extinguished and an "overhaul" of the room began.
The overhaul consisted of, among other things, pulling the tiles from the ceiling. Subsequently, members of the department remained at the barn and returned the next day to remove debris and work inside the barn. Several of the men described the room as being filled with dust and haze during the work. After the tile was removed, plywood was installed on the ceiling. The record indicates that after the barn was prepared, it began to be used as a training facility for firefighters throughout the state.
The Natchitoches firefighters allege that they were never informed that the building could contain asbestos, but that rumors began to circulate after the fire. Several of the men stated that they first knew of a potential exposure problem due to an investigation by the Hazardous Materials Section of the Louisiana State Police. Soon thereafter, on December 8, 1993, a memorandum was placed in the firehouse wherein the chief of the department informed them that they had, indeed, been exposed to asbestos.
The first petition instituting this matter was filed in July 1994. In that petition, the plaintiffs alleged that, despite the defendant's specific knowledge of the presence *699 of asbestos, they were not warned and that "as a result of the direct, willful, and wanton negligence of the defendants herein, they have been unduly exposed to a very hazardous substance which is known to cause lung cancer and other pulmonary complications." Named as defendants were the Board of Supervisors of LSU, LSU Firemen Training Program, James Hebert, and Northwestern State University. Due to the alleged exposure, the plaintiffs sought recovery for past, present, and future mental pain, future physical pain and suffering, and future medical expenses. Additionally, the plaintiffs sought exemplary damages pursuant to La.Civ. Code art. 2315.3.[2]
Following a bench trial lasting several days, the trial court found the Board of Supervisors of LSU liable, but dismissed the claims against the remaining defendants. In written reasons for judgment, the trial court noted that the plaintiffs' individual exposure to the asbestos varied warranting division of the plaintiffs into three categories. The first of these categories are firefighters who responded to the fire at the barn on August 5, 1991, and fought to bring the fire under control. This group also contains plaintiffs who, although they did not strictly fight the fire, were present during the time of the fire and helped in demolition and reconditioning of the room. Members of this group were awarded $30,000.00 each in compensatory damages. The second group contains firefighters who, subsequent to the fire, had contact with the barn during fire fighting instruction and training classes. Finding this group had less exposure than the first group, the trial court awarded each plaintiff in this group $15,000.00. The final group are firefighters who had no direct contact with the building, but who maintained that they were exposed to dangerous asbestos fibers by the proximity of their own firefighting equipment at the fire stations to the equipment carried by the firefighters involved in fighting the fire. The trial court found that any exposure to this group was minimal and, therefore, denied any damages.
In addition to compensatory damages, the trial court awarded the plaintiffs in the first two groups $12,000.00 each for medical monitoring due to the latency period attendant to asbestos-related disease. With regard to the plaintiffs' request for exemplary damages pursuant to La.Civ. Code art. 2315.3, the trial court denied these damages finding that the statute was not applicable as the case does not involve transportation, storage, or handling of hazardous materials.
The defendant appeals asserting that the trial court erred in finding liability and in awarding medical monitoring costs. With regard to the damages awarded, the defendant alleges that any award was in error since the plaintiffs failed to prove that they were exposed to anything other than non-friable asbestos, which is not as hazardous as friable asbestos and, further, that the plaintiffs' limited exposure was unlikely to result in any increase in disease. As for medical monitoring costs, the defendant maintains that the court erred both in awarding these future medical expenses and in awarding them in lump sum fashion rather than depositing them with the court.

Discussion

Liability and Compensatory Damages
Essentially, the defendant's assertion in this regard is that the trial court erred in imposing liability as there was no duty owed to the plaintiffs. LSU maintains that the plaintiffs failed to prove that LSU *700 owed a duty to warn the firefighters entering the building since there was no evidence that they were ever exposed to anything other than non-friable asbestos, a substance not classified as a hazardous material. Furthermore, LSU asserts that the plaintiffs failed to prove that they sustained any damages since any exposure was of such limited duration and intensity that any risk of harm was minimal or nonexistent.

Duty-Risk Analysis
As the plaintiffs' petition essentially sought recovery for the allegedly negligent conduct of the defendant, we will consider this matter in light of the duty/risk analysis attendant to La.Civ.Code art. 2315.[3] In order to satisfy this analysis and recover under a negligence theory of liability, a plaintiff must prove as follows:
(1) [T]he defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element).
Roberts v. Benoit, 605 So.2d 1032, 1052 (La.1991)(on rehearing).
As for the existence of a duty, the defendant maintains that the plaintiffs failed to establish the existence of a duty to warn of the presence of asbestos in the building. The defendant asserts in brief that the plaintiffs were exposed only to non-friable asbestos, a substance not classified as a hazardous material.[4] Whether their ultimate exposure was only to friable or non-friable asbestos is not controlling as to this issue. LSU had knowledge as the presence of asbestos in the building, and permitted the men to work in the building without further inquiry.[5] Further, *701 the testimony of Master Trooper Richard Ortego of the Hazardous Materials Section of the Louisiana State Police revealed that this testing of material from the building revealed that two types of asbestos were present, one of which could not be disposed of in an industrial landfill. Regardless of the classification of the material as friable or non-friable, LSU personnel failed to warn the firefighters of its presence despite their disturbance of the suspect material in fighting the fire, the subsequent overhaul, and the preparation of the building for use as a training facility. Under such circumstances, we do not agree with the defendant's assertion that no duty to warn of hazardous material could exist.
The bulk of the defendant's argument as to their liability falls within the scope of the risk element. This fact-intensive element, which has been described as a policy determination, inquires "`whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" Roberts, 605 So.2d at 1044-45 quoting Crowe, The Anatomy of a Tort-Greenian, as Interpreted by Crowe who has been Influenced by MaloneA Primer, 22 Loy.L.Rev. 903, 906 (1976).
The defendant argues that, in the event any duty with regard to asbestos was due, it was not due these firefighters given the particular circumstances present in this case. Namely, the defendants assert that the non-friable asbestos contained in the transite ceiling tile is not classified as a hazardous material. In their brief to this court, the defendant asserts that "[t]ransite is pretty hard. If it is in place, it will not emit asbestos fiber." They further state that "[i]f one does not disturb transite, containing asbestos, it is not a problem." While this description of the tile coincides with evidence in the record, the firefighters were permitted to work in the barn, without knowledge of a potential danger, when LSU personnel knew that the tile would not be left in place or remain undisturbed. Rather, the record indicates that, in the course of fighting the fire, conducting the overhaul, and completing the renovation, the ceiling tile was pulled onto the floor. The condition of the room during these events was described by witnesses as dusty and hazy. Furthermore, the testimony of Trooper Ortego indicates that non-friable asbestos was not the only type of asbestos present in the barn.
Another consideration important to the scope of the duty or legal cause inquiry is whether the defendant's duty to warn existed in an instance where the firefighters' exposure was of limited duration. The plaintiffs' time spent in the barn ranged from only a few hours to only a few days. The defendant asserts that this limited *702 exposure could not present a hazard to the firefighters' health. While expert testimony exists indicating that duration and intensity of exposure are factors in determining risk of developing an asbestos-related disease, we do not conclude that the trial court was required to find that limited exposure precludes imposition of a duty in this instance. Rather, the trial court was presented with evidence indicating that LSU had knowledge of the presence of asbestos and, in the face of such information, permitted the firefighters to enter the barn and aggressively handle suspect material without sufficient information to take precaution. Furthermore, the record contains the testimony of Dr. Glenn Gomes, a doctor specializing in pulmonary medicine, who stated as follows with regard to short-term exposure: "Well, I think any exposure to asbestos is significant. They may have a slightly higher risk of developing certain types of cancer, specifically the mesothelioma, but it's impossible for me to give you an estimate as to how much that is." In light of this information, we find no error in the imposition of a duty under these circumstances.
Having found that the record supports a finding of a duty and that the plaintiffs were within the scope of that duty, we next turn to whether that duty owed was breached. Evidence presented at trial indicates that LSU personnel knew that asbestos was possibly contained within the building and that work was to be taking place in the building. Further, the plaintiffs testified that they were not informed, either during the fighting of the fire or during the demolition/restoration of the room, that there was potential exposure. Additionally, during subsequent training in what was described as a dusty room, no information was ever given the firefighters that could have alerted them to the potential of remaining asbestos.
As for the cause-in-fact element, this prong of the inquiry is clearly established by the record. The fact that personnel employed by LSU knew of the asbestos-containing material and did not inform the firefighters as to its existence led to their exposure and subsequent concern. The plaintiffs' testimony reveals that, had they been equipped with this knowledge, they would have taken precautions or not entered the building. In fact, Earl Hardison, an assistant chief with the fire department, stated that if he had been informed of the existence of the asbestos, he probably would have held his men out of the building and allowed it to burn rather than endanger their health by sending them into the building.
The final element necessary for a recovery under negligence is proof of actual damages. Here, too, the record supports the trial court's determination that the plaintiffs proved that they sustained injury. Not only did they suffer the obvious physical exposure to asbestos, but the plaintiffs testified as to their concern for their health after learning that they had been exposed. Testimony at trial reveals that the group's exposure to asbestos in the barn is a matter of regular conversation at the firehouse. Although the degree of concern for their health varied with each plaintiff, each testified that they had increased concern due to their exposure and that they worried about their future health. Repeatedly, the firefighters expressed concern over whether they would be able to see their children grow up, what impact an asbestos-related illness could have on their family, and whether family members could have received second-hand exposure by contact with their debris-covered clothing. One firefighter sought assistance from a counselor while others testified that they now worried about the impact the exposure could have on their retirement. Thus, we find no error in the trial court's determination that the damages element had been proven.

Recovery for Mental Damages in the Absence of Physical Injury
The defendant also maintains that the trial court erred in awarding damages *703 to the plaintiffs in the absence of any proof indicating that any exposure caused physical injury. For support of this proposition, LSU cites the United States Supreme Court case of Metro-North Commuter R.R. Co. v. Buckley, 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) and the Louisiana Supreme Court case of Moresi v. State Through Dept. of Wildlife and Fisheries, 567 So.2d 1081 (La.1990). Reference to Metro-North, indicates that, in that case, the Supreme Court was concerned with whether a claimant must necessarily demonstrate physical injury before being able to recover for mental damages under FELA. Given the Court's concern with statutory wording attendant to FELA claims, we do not find that case controlling in this matter.
In Moresi, 567 So.2d 1081, the Louisiana Supreme Court observed that, generally, "if the defendant's conduct is merely negligent and causes only mental disturbance, without accompanying physical injury, illness or other physical consequences, the defendant is not liable for such emotional disturbance." Id. at 1095. However, the court noted that Louisiana jurisprudence has often deviated from this general rule and that "these categories have in common the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Id. at 1097.
In the present case, we conclude that the general rule explained in Moresi, and the deviations explained therein, provide clearly that under circumstances such as are present in the instant case, recovery may be had for mental injuries. Although perhaps minimal, the plaintiffs established that they were exposed to asbestos containing material and presented evidence indicating that their risk of developing an asbestos-related disease could have been increased by this exposure, even if in a limited sense. Therefore, the defendant, in some degree, presented evidence of physical consequence.
However, even if we were to find that there was no evidence of physical injury, we conclude that the plaintiffs' claim regarding asbestos exposure is one that carries an "especial likelihood of genuine and serious mental distress ..." and one "arising from special circumstances, which serves as a guarantee that the claim is not spurious." Moresi, 567 So.2d at 1097. In Straughan v. Ahmed, 618 So.2d 1225 (La.App. 5 Cir.), writ denied, 625 So.2d 1033 (La.1993), the fifth circuit concluded that such special circumstances existed where a plaintiff had developed "cancer-phobia," but that the defendant's doctor's negligence was not a cause of the physical injury. Rather, any negligence by the doctor affected the plaintiff's state of mind. Under these circumstances, the court concluded that the special circumstances addressed in Moresi existed.
Further, in Vallery v. Southern Baptist Hosp., 630 So.2d 861 (La.App. 4 Cir.1993), writ denied, 94-0249 (La.3/18/94); 634 So.2d 860, the fourth circuit concluded that the wife of a hospital worker exposed to HIV could maintain a cause of action for negligent infliction of emotional distress where she had ultimately tested negative for the virus. See also Raney v. Walter O. Moss Regional Hosp., 629 So.2d 485 (La. App. 3 Cir.1993)(wherein the third circuit found the existence of special circumstances and affirmed a trial court's award of damages to family members of a hospital worker who was exposed to hepatitis "B" for their fear of personally contracting the disease), writ denied, 94-0347 (La.4/7/94); 635 So.2d 1134. But see Walker v. Allen Parish Health Unit, 97-1007 (La.App. 3 Cir. 4/1/98); 711 So.2d 734 (wherein the third circuit affirmed a summary judgment against parents seeking recovery for mental anguish after their child was pricked at the defendant health unit by a needle that had been used for immunization of a member of the general public).
In consideration of the above-described jurisprudence and evidence indicating that *704 the plaintiffs' risk of disease may have been increased, even if minimally, we find no error in the award of damages for mental anguish.

Expert Testimony
The defendant also argued in their brief to this court that the trial court erred in disallowing some of the testimony of John Storment, a court-accepted expert in the areas of environmental engineering and industrial hygiene. Although the trial court admitted Storment's testimony in some areas, the expert was required to proffer testimony and evidence relating to tests he conducted in other areas of the barn in 1995. In these tests, he attempted to recreate the environment in Room 105 on the day of the fire and in the subsequent overhaul/reconstruction phase and monitor asbestos levels in the room during this test. The trial court would not allow this evidence finding that the conditions of Room 105 during the fire could not be recreated. The defendant maintains that this evidence, along with the results of fiber monitoring tests, should have been admitted and that they demonstrate any exposure to asbestos was very minimal.
While La.Code Evid. art. 402 provides that all relevant evidence is admissible, unless otherwise excluded, La.Code Evid. art. 403 provides the following limitation: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." In such evidentiary matters, trial judges enjoy great discretion and their rulings in this area will only be reversed upon an abuse of that discretion. Terrebonne v. Goodman Mfg. Corp., 96-450 (La.App. 5 Cir. 12/30/96); 687 So.2d 124. We find no such abuse with regard to the proffered testimony and evidence.
Our review of the record reveals that the trial court required the proffer of this evidence because he believed that the expert could not testify as to the conditions present in Room 105 on the day of the fire. In particular, he noted that the intense heat and smoke of the fire could not be recreated and that there was no evidence indicating that the ceiling tiles removed during the testing, which was conducted in rooms other than 105, were the same type of tiles involved in the fire. Furthermore, we observe that, even though he accepted the testimony on proffer only, the trial judge stated that, after hearing the proffered testimony, he might choose to accept it. In the end, the testimony remained on proffer. After reviewing this matter, we do not conclude that the trial court's concerns and ultimate exclusion of the evidence was an abuse of discretion.

Comparative Fault
The defendant also maintains that the trial court erred in failing to assign a portion of the fault to the plaintiffs in this matter. LSU argues that the plaintiffs should have kept on their self-contained breathing apparatus (SCBA), particularly those plaintiffs at the fire. They argue that, if this practice had been followed, they would not have breathed in any hazardous material.
The allocation of fault is a factual matter that lies within the discretion of the trial court. Grant v. Allstate Ins. Co., 96-1028 (La.App. 3 Cir. 6/4/97); 696 So.2d 275, writs denied, 97-1579 (La.10/10/97); 703 So.2d 605, 97-1717 (La.10/10/97); 703 So.2d 606. Such a determination will not be disturbed in the absence of manifest error. Id. Our review of the evidence regarding the plaintiffs' wearing of the SCBA reveals no such error.
While testimony indicates that firefighters are trained to wear SCBA, there is no proof requiring a finding that the plaintiffs who did not continuously wear SCBA while inside the building breached a duty of care. First, we note that the firefighters wore their air tanks in varying degrees while fighting the fire. Some felt that they did not require it for their particular tasks while others did. There was *705 other evidence indicating that individual air tanks were used until empty. Furthermore, during training and the reconditioning of the room, it appears that there would have been no indication that the firefighters needed the use of SCBA in the absence of knowledge there was the possibility of asbestos exposure. Thus, given wide-ranging factors, we find no error in not apportioning fault to the plaintiffs.

Quantum
The defendant maintains that the award of $30,000.00 and $15,000.00 to the plaintiffs was an abuse of discretion. They refer this court to other cases regarding fear of disease wherein the plaintiffs were awarded lesser amounts.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), the supreme court explained the standard by which general damage awards are reviewed. The court stated as follows:
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La. 1974).
Id. at 1260-61.
Our review of the circumstances in this case reveals no abuse of discretion in the trial court's award of $15,000.00 to each of the plaintiffs involved in training in the facility and $30,000.00 to each of the plaintiffs involved in fighting the fire and reconditioning the building. We reach this conclusion after consideration of the plaintiffs' concerns regarding their health and families. Finding the award reasonable, we do not consider this award in light of previous awards in similar circumstances.

Medical Monitoring
The defendant argues that the trial court erred in awarding $12,000.00 to each of the plaintiffs for medical monitoring during the latency period of asbestos-related diseases. Their argument in this area is twofold. First, the defendants maintain that the award was in error in light of the standards for medical monitoring recently enunciated by the supreme court in Bourgeois v. A.P. Green Indus., Inc., 97-3188 (La.7/8/98); 716 So.2d 355. Further, the defendant contests the lump sum nature of the award and maintains that any medical monitoring award should have been entrusted with the court.
Although not rendered until after judgment was entered in the present matter, the supreme court has recently approved a cause of action for medical monitoring for asymptomatic employees who have had significant exposure to asbestos. See Bourgeois, 97-3188 (La.7/8/98); 716 So.2d 355. Although subsequently rendered, we find this case controlling in our review of the medical monitoring award now before the court.
Noting that medical expenses have not been awarded in the past absent a corresponding physical injury, the court stated that "[u]nlike a car crash, asbestos exposure is an accident almost always without impact. Nevertheless, it is still an accident that can have consequences every bit as real as those sustained in a head-on collision." Bourgeois, 97-3188, p. 5; 716 So.2d at 358. After finding an award for medical monitoring compensable under La. Civ.Code art. 2315, the supreme court stated that such expenses are recoverable only upon satisfaction of the following criteria:
(1) Significant exposure to a proven hazardous substance.

*706 . . . .
(2) As a proximate result of this exposure, plaintiff suffers a significantly increased risk of contracting a serious latent disease.
. . . .
(3) Plaintiff's risk of contracting a serious latent disease is greater than (a) the risk of contracting the same disease had he or she not been exposed and (b) the chances of members of the public at large of developing the disease.
. . . .
(4) A monitoring procedure exists that makes the early detection of the disease possible.
. . . .
(5) The monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles.
. . . .
(6) The prescribed monitoring regime is different from that normally recommended in the absence of exposure.
. . . .
(7) There is some demonstrated clinical value in the early detection and diagnosis of the disease.
Id. at p. 9-11; 360-61.
Our review of the present matter in light of the above-listed factors indicates that a reversal of the medical monitoring award is necessary. As previously discussed, the plaintiffs presented testimony indicating that they may now have a slightly increased risk of asbestos-related disease and that this increase, however slight, has caused concern. While true that the plaintiffs' expert, Dr. Gomes, recommended regular chest x-rays and pulmonary studies for the exposed men, we find that his testimony indicates that the second factor listed by the supreme court in Bourgeois has not been satisfied in this case. Under the second factor, a plaintiff must prove that he suffers a "significantly increased risk of contracting a serious latent disease." Id. at p. 9; at 360. The supreme court explained that "[n]o particular level of quantification is necessary to satisfy the requirement of increased risk" Id. Further, "plaintiff need not prove a certain probability of actually suffering physical harm because of his or her exposure. It is sufficient that plaintiff show a significant degree of increased risk." Id.
Although Dr. Gomes stated that any exposure to asbestos is significant, he also testified that any increase in the risk of asbestos-related disease would be slight. This opinion regarding the minimal nature of any increase in risk was shared by the defendant's experts. While this minimal increase in the risk of disease supports the plaintiffs' demonstrated concern and, in turn, supports an award of general damages, the above-listed factors indicate that the presence of only a limited increase is insufficient to satisfy the objective test enunciated in Bourgeois. Rather, the supreme court has stated that this increase must be significant. Thus, compensable mental injuries do not necessarily have to coexist with a proven need for medical monitoring. Our review of the evidence indicates that the present case is such an instance. We, therefore, reverse the award for medical monitoring while affirming the award for general damages.

Prescription
In its' final argument, the defendant maintains that the plaintiffs' claims prescribed prior to the filing of suit as the fire occurred on August 5, 1991, and the suits were not filed until July 1994. The defendant asserts that "[i]f the firefighters worried enough about asbestos being in the building to have mental anguish, that is certainly sufficient constructive notice to excite further inquiry, to begin the running of prescription."
La.Civ.Code art. 3492 provides, in part, that: "Delictual actions are subject to liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained."
*707 We note that the record contains an exception of prescription filed by the defendant. However, the minutes contained in the record indicate that the matter was not heard by the court as no one was present to argue the motion. Thus, there is no indication that this matter was ever properly presented for the lower court's consideration. In any event, we conclude that the defendant's argument is without merit. The plaintiffs testified that although there had been rumors that something had been amiss during the dairy barn fire, there is nothing to indicate that these rumors were of such a nature to indicate that the plaintiffs should have known of any exposure. Furthermore, they did not receive actual notice of the asbestos exposure until the notification memorandum was placed in the firehouse in December 1993. Several of the plaintiffs testified that they first became aware of the exposure immediately before the December 1993 memorandum when they were questioned by the state police. Suit was filed within one year of this notice. Therefore, we find the defendant's argument in this regard meritless.

DECREE
For the foregoing the judgment of the lower court is affirmed as it relates to general damages and reversed as it relates to the award for medical monitoring. Costs of this appeal are set in the amount of $3,424.50 and are to be divided equally between the plaintiffs and the defendant, Board of Supervisors of Louisiana State University.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
NOTES
[1] This matter is consolidated with James Bloodworth v. Board of Supervisors of LSU, 98-1278 (La.App. 3 Cir. 3/24/99), 735 So.2d 707. Although the plaintiffs differ, the claims against the defendant are common to both suits. Therefore, we discuss both cases in this opinion.
[2] La.Civ.Code art. 2315.3, which has since been repealed, provided as follows at the time of the alleged conduct in this matter:

In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances. As used in this Article, the term hazardous or toxic substances shall not include electricity.
[3] La.Civ.Code art. 2315 provides, in part, as follows: "Every act whatever of man that causes damages to another obliges him by whose fault, it happened to repair it."
[4] La.R.S. 40:1749.1 provides, in part, as follows:

A. The legislature finds that friable asbestos containing materials and other hazardous component materials in any environment occupied by human beings creates a serious hazard to health. The existence of such hazards should not be tolerated in the public buildings in this state, and it is incumbent upon state government to take initiative to see that such hazards are detected and that appropriate abatement actions are taken.
. . . .
E. For purposes of this Section, "friable asbestos" and asbestos containing materials shall have the same meaning as defined in R.S. 30:2343.
F. For the purpose of this Section, "public building" means those buildings owned or leased by the state of Louisiana, except those buildings constructed after 1978, unless it is determined that there is a possibility of the presence of these hazardous component materials.
As can be seen above, La.R.S. 40:1749.1 relies on the definition of key terms as provided by La.R.S. 30:2343 which contains the following:
(2) "Asbestos" means the asbestiform varieties of: chrysotile (serpentine); crocidolite (riebeckite); amosite (cummingtonitegrunerite); anthophyllite; tremolite; and actinolite.
(3) "Asbestos-containing material" means any material which contains more than one percent asbestos by weight.
. . . .
(6) "Friable material" means any material applied onto ceilings, walls, structural members, piping, ductwork, or any other part of a building structure which, when dry, may be crumbled, pulverized, or reduced to powder by hand pressure.
[5] Gary Durham, Executive Director of Public Safety & Risk Management for LSU, discussed the LSU safety manual in effect in 1991. He stated that Thomas Hebert should have had a copy and that James Hebert should have been given one and that, in the present case, the policy guidelines were not followed. The portion of the policy regarding asbestos is contained in the exhibits and provides, in part, as follows:

It has been apparent for some time that asbestos fibers can cause lung disease.
Accordingly, the Environment Protection Agency (EPA) and subsequently the Louisiana Department of Environmental Quality (DEQ) have developed strict regulations regarding the use, removal, and disposal of asbestos and asbestos containing material.
Removal and disposal of asbestos and/or asbestos containing material is a very exacting process and must be done only by individuals who have been specially trained and certified to perform such tasks.
Presently, LSU Physical Plant has the trained and certified personnel to perform such work. Anticipated work that might involve asbestos or asbestos containing material shall be coordinated through Physical Plant or the Office of Campus Safety. The above is true if it is only suspected that asbestos could be involved.
Removal of material such as floor tiles, acoustical ceiling tiles, ceiling and wall plaster, insulated pipes, or removal of insulation from pipes or any sprayed or trowled on material within a building is not acceptable unless done by Physical Plant's trained and certified workers.
If a building occupant suspects asbestos problems, i.e. dust or fallen material on floors, exposed pipe insulation, etc., he or she shall report it to Physical Plant or office of Campus Safety.
The presence of asbestos containing materials does not mean that the health of buildings occupants is endangered. If asbestos containing materials remain in good condition and are unlikely to be disturbed, exposure will be negligible. However, when fibers are released, they can create a potential hazard for building occupants.