832 So.2d 1016 (2002)
Louis COLEMAN, Individually and as Father of Louis Frank Coleman
v.
Dr. Richard DENO, Dr. Ivan Sherman and JoEllen Smith Hospital.
No. 99-CA-2998.
Court of Appeal of Louisiana, Fourth Circuit.
November 6, 2002.
Rehearing Denied as Amended December 17, 2002.
*1018 Michelle A. Bourque, Jones, Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P., New Orleans, LA, for Statutory Intervenor/Appellant, The Louisiana Patients' Compensation Fund.
Gerald E. Meunier, Gainsburgh, Benjamin, David, Meunier & Warshauer, and Frank J. D'Amico, Jr., Judith A. Gic, New Orleans, LA, for Plaintiff/Appellant, Louis Coleman.
Stewart E. Niles, Jr., Karen M. Fontana, Jones, Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P., New Orleans, *1019 LA, for Defendant-Appellant, Dr. Richard Dino.
(Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER, Judge DENNIS R. BAGNERIS, Sr., and Judge MICHAEL E. KIRBY).
WILLIAM H. BYRNES, III, Chief Judge.
In this medical malpractice claim, with respect to damages, the Louisiana Supreme Court remanded this case to this Court "both for a meaningful quantum review and a recasting of the ultimate judgment in accordance with the limitations of the LMMA [Louisiana Medical Malpractice Act, La. R.S. 40:1299.41 et seq"] Coleman v. Deno, XXXX-XXXX (La.1/25/02), 813 So.2d 303.
The plaintiff Louis Coleman was seen twice at the JoEllen Smith Hospital emergency room on June 7 and 8, 1998. He was transferred to Charity Hospital in New Orleans ("Charity") shortly after midnight on June 9, 1988, and later his left arm was amputated on June 11, 1988, resulting from the development of a compartment syndrome. The plaintiff filed requests with the medical review board for review of his claims against the private health providers, JoEllen Smith Hospital, Dr. Ivan Sherman and Dr. Richard Deno under La. R.S. 40:1299.41 et seq. At the same time, Coleman filed a request for review of Charity under the Medical Liability for State Services Act, La. R.S. 40:1299.39 et seq. After the medical review panel found no breach of the standard of care by the private providers, Coleman filed suit in civil district court.
Prior to trial, Coleman settled his claims against JoEllen Smith Hospital for $10,000, and against Charity Hospital for $25,000. After the trial, the jury awarded $4,400,000 in general damages to the plaintiff, plus $500,000 for loss of wages, as well as diminished earning capacity. The trial court noted the amount of $500,000 found by the jury for future medical expenses.[1] For the loss of consortium of the plaintiff's minor son, Louis Frank Coleman, the jury awarded $1 million, which the trial court reduced to $10,000. The jury found that Dr. Ivan Sherman was 20 percent at fault and Dr. Richard Deno was 80 percent at fault. The Patient's Compensation Fund ("the Fund") intervened.
The trial court granted a judgment notwithstanding the verdict ("JNOV") as to Dr. Sherman and dismissed the claims against him. The trial court found that interest was to be apportioned as provided in La. R.S. 40:1299.41 et seq. The trial court noted Coleman's need of future medical care and related benefits in the amount of $500,000 but did not enter judgment on this amount. The trial court found that Dr. Deno was solely at fault, but applied the LMMA to limit the damage award against Dr. Deno to $100,000. The trial court allocated that amount proportionately between Coleman and his son, who was entitled to $10,000 for loss of consortium. The trial court found that the parties had stipulated that Coleman settled with Charity for $25,000 and JoEllen Smith Hospital for $10,000; however, the trial court did not find that the Patient's Compensation Fund was entitled to a credit of $110,000 for the two pre-trial settlements. The trial court entered judgment against the Fund for $400,000 plus interest under the LMMA.
*1020 The plaintiff Louis Coleman, Dr. Deno, and the Louisiana Patients' Compensation Fund appealed to this Court. Three members of a five-judge panel affirmed the trial court's judgment but found that the damage award was not subject to the medical cap of $500,000 under the LMMA, R.S. La. R.S. 40:1299.41 et seq., because of the intentional tort of improper transfer to another hospital or "patient-dumping" claim against Dr. Deno. This Court allocated $500,000 to the medical malpractice claim and $4,400,000 to the intentional tort claim. This Court affirmed the trial court's notation of Coleman's need for future medical care and related benefits in the amount of $500,000 but did not enter judgment on this amount. This Court affirmed the dismissal of the claims against Dr. Sherman, and the $500,000 award to the plaintiff for loss of wages, as well as diminished earning capacity. This Court found that the $10,000 award to the plaintiff's son was not included in the $500,000 cap and the awards to father and son should not be prorated within the cap. This Court held that the Fund was entitled to a credit of $100,000 for the larger settlement of $25,000 with Charity and a dollar for dollar credit for the smaller settlement of $10,000 with JoEllen Smith Hospital. The award of interest was affirmed. Coleman v. Deno, 99-2998 (La.App. 4 Cir. 4/25/01), 787 So.2d 446.
In granting writs, the Louisiana Supreme Court: (1) affirmed the JNOV of the dismissal in favor of Dr. Ivan Sherman; (2) found that the "patient-dumping" claim against Dr. Deno fell within the definition of medical malpractice under the Louisiana Medical Malpractice Act, making the plaintiff's recovery subject to the $500,000 limitation set forth in the Act; (3) held that Charity Hospital was 75 percent at fault, while reducing the percentage of Dr. Deno's fault to 25 percent; and (4) remanded the case to this Court for further review of damages.

ASSESSMENT OF DAMAGES
On remand, the plaintiff Coleman contends that this Court should: (1) uphold the jury verdict of damages, (2) reject the argument that the statutory cap on damages should be applied twice in the formulation of the plaintiff's recovery; and (3) reject the extension of any settlement credit to the Fund based upon the plaintiff's pretrial settlement with JoEllen Smith Hospital ("JESH").
Dr. Deno submits that: (1) the general damage award is excessive; (2) evidence of quantification of future medical care was improperly admitted; (3) the $500,000 for lost wages or diminished earning capacity should be reversed; (4) the plaintiffs son's loss of consortium award is not supported by the evidence; and (5) Dr. Deno's liability is limited to 25 percent of the lesser of the reduced award or $100,000.
The Fund maintains that: (1) Dr. Deno's liability is limited to $100,000 plus interest accruing after April 1, 1991, and the plaintiffs total recoverable damages is limited to $500,000, exclusive of medical care and related benefits; (2) the general damage award is excessive; (3) the $500,00 special damage award for lost wages or diminished earning capacity should be reversed; (4) the $10,000 loss of consortium awarded to the plaintiffs son should be reversed; (5) the $500,000 award for future medical and related expenses should be reversed; (6) any future medical expenses must be made to the Fund's oversight board only as expenses are incurred; (7) fault must be apportioned as 25 percent to Dr. Deno and 75 percent to Charity Hospital so that the plaintiffs recovery against Dr. Deno and the Fund must be reduced by 75 percent, representing Charity Hospital's percentage of fault; and (9) the Fund is entitled to a credit of $110,000 for the plaintiffs pretrial settlements with JESH and Charity Hospital.
*1021 As stated in this Court's original opinion, Coleman v. Deno, supra, consideration of the jury's determination of damages is limited to a review for abuse of discretion on appeal. The discretion vested in the trier of fact is "great," and even vast, in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), certiorari denied, sub nom. Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). When damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. La. C.C. art.1999; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Reck v. Stevens, 373 So.2d 498, 501 (La.1979); Merritt v. Karcioglu, 96-0431 (La.2/25/97), 687 So.2d 1002, 1004-07, amended on rehearing in part by 96-0431 (La.5/9/97), 693 So.2d 153. Only after a determination of an abuse of discretion is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point that is reasonably within that discretion. Youn, supra.
Dr. Deno and the Fund argue that the jury award is grossly excessive and is not supported by the record. The Fund requests that this Court grant a new trial on the issue of damages or reduce plaintiffs general damages of $4,400,000, plus $500,000 for loss of wages and diminished earning capacity, as well as the noted amount of $500,000 for future medical expenses.
Counsel for Dr. Dino points out that Coleman did not require subsequent hospitalizations or surgeries related to the loss of his arm. He is capable of performing self-care activities and is capable of and does drive. Dr. Dino claims that Coleman has not suffered from any debilitating depression related to his injury. Dr. Dino asserts that Coleman's psychiatric witness, Dr. Richard Richoux, agreed that the plaintiff has not had any unusual reaction to the loss of his arm and is capable of functioning in society. Dr. Dino avers that Dr. Richoux agreed that there is no reason from a psychiatric standpoint why the plaintiff would not be able to work. Dr. Dino contends that the general damage award must be reduced to a sum between $200,000 to $350,000.

GENERAL DAMAGE AWARD
On review, as previously noted, general damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors that affect the victim's life. Delphen v. Department of Transp. and Development, (La.App. 4 Cir. 5/24/95), 657 So.2d 328, writ denied, 95-2116 (La. 11/16/95), 663 So.2d 716, and writ denied, 95-2124 (La.11/17/95), 663 So.2d 717. The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific. The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991).
In Thornton v. National RR Passenger Corp., 2000-2604 (La.App. 4 Cir. 11/14/01), 802 So.2d 816, writ denied, XXXX-XXXX (La.3/15/02), 811 So.2d 907, this Court held that the award of $1,500,000 in general damages was not a clear abuse of the jury's discretion. In that Federal Employers' Liability Act ("FELA") case, this Court concluded that the employee was impaired with permanent disabilities as a result of his disfigured hands. The plaintiff/employee was injured as a result of his *1022 work activities as a railroad car-man for Amtrak. Thornton was replacing bolster springs on a railcar when the wood blocking used to support the railcar gave way, pinning his hands down for approximately five minutes. The plaintiff had injuries to both hands, including fractures of the right small finger, and to both the left ring and small fingers. The left hand included the amputation of his small finger and a pin fixation of his ring finger. His injuries and the effect of injuries on his ability to perform physically demanding jobs were taken into account. In the present case, the effect of injuries on the plaintiff Coleman's ability to perform physically demanding jobs and his performance as a boxer should be taken into account. The defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortuous conduct. Wailwright v. Fontenot, XXXX-XXXX (La.10/19/00), 774 So.2d 70.
The Fund asserts that the present case is not subject to the same standard of review as Thornton, supra, and other FELA cases. In DeBiasio v. Illinois Central Railroad, 52 F.3d 678, 685 (6 Cir. 1995), the Sixth Circuit notes that under FELA, the plaintiff's burden of proof is significantly lighter than in an ordinary negligence case. FELA cases involve an employer's liability to a railroad employee for work-related injuries occurring during the course and scope of the worker's employment. In Thornton, 802 So.2d at 821-822, this Court quoted E'Teif v. National Railroad Passenger Corp., 98-2503 (La. App. 4 Cir. 4/22/99), 733 So.2d 155, as follows:
In FELA actions brought in state court, federal substantive law applies. However, state rules of procedure apply in state court. St. Louis Southwestern Ry. v. Dickerson, 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985). Accordingly, state courts are governed by federal law in determining whether the evidence is sufficient to support a jury's verdict. Dufour v. Union Pacific R.R., 610 So.2d 843-846 (La.App. 1 Cir.1992), aff'd, 614 So.2d 1263 (La. 1993) citing Trahan v. Gulf Crews, Inc., 260 La. 29, 255 So.2d 63, 66-67 (1971). Ellender v. Texaco, Inc., 425 So.2d 291, 294 (La. App. 3 Cir.1982). The United States Supreme Court has stated that the standard for reviewing whether a FELA plaintiff's evidence is sufficient to support the jury's verdict is whether, viewing the evidence in the light most favorable to the plaintiff, there is a "complete absence of probative facts to support the conclusion reached by the jury." Dennis v. Denver & Rio Grande Western R.R. Co., 375 U.S. 208, 210, 84 S.Ct. 291, 11 L.Ed.2d 256 (1963). Brady v. Southern R.R., 320 U.S. 476, 479, 64 S.Ct. 232, 88 L.Ed. 239 (1943). Rogers v. Missouri Pacific R.R. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957).
The appellate courts of this state have afforded great weight to jury verdicts in FELA cases. The First and Second Circuits have required a "complete absence of probative facts" before disturbing a jury's award. Dufour, 610 So.2d at 846. Broussard v. Union Pacific R.R., 29,769, 29,770, and 29,768 (La.App. 2 Cir. 8/28/97), 700 So.2d 542, 548.... Our own Court has required that there be clear abuse of the jury's "much discretion." Jackson v. CSX Transp., Inc., 97-0109 (La.App. 4 Cir. 12/23/97) 712 So.2d 514, 522, writs denied, 98-0417 and 98-0418 (La.4/3/98), 717 So.2d 1130, certiorari denied, 525 U.S. 870, 119 S.Ct. 166, 142 L.Ed.2d 136 (1998). On the subject of jury verdicts in these types of cases, the Louisiana Supreme Court has held:
They must stand unless there is no evidence to sustain them, rendering them, as some courts have put it, so excessive as to be obviously punitive, *1023 motivated by prejudice, passion, partiality, or corruption. This is particularly true where the trial judge, finding the jury award is not excessive, has denied a new trial and/or remittitur. Trahan, 255 So.2d at 70.
98-2503 at 3-4, 733 So.2d at 157 (footnote omitted).
In reviewing the general damage award in Thornton, 802 So.2d at 823-824, this Court stated:
Finally, Amtrak argues that the $1.5 million general damage award is clearly excessive and bears no rational connection to the evidence, and therefore should be set aside as an abuse of the jury's broad discretion. The correct standard to be applied in FELA cases to determine whether a general damage award is supported by the evidence is the same as that applied in other Louisiana cases. See Lilley v. Board of Supervisors of Louisiana State University, 98-1277 (La.App. 3 Cir. 3/24/99), 735 So.2d 696, which quoted the following standard from Louisiana Supreme Court's decision in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993):
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
98-1277 at 17-18; 735 So.2d at 705, quoting Youn, 623 So.2d at 1260-61.

* * *
Following our review of the record evidence in this case, we find that the jury's $1.5 million general damage award is not a clear abuse of the "much discretion" of the trier of fact because it is not excessive "for the particular injuries and their effects under the particular circumstances on the particular injured." Youn, 623 So.2d at 1260. In Youn, the Supreme Court acknowledged that in reviewing a damage award, the appellate court should consider more than just the injuries sustained. In the instant case, Mr. Thornton was pinned down for at least five minutes, suffering mental and physical agony. He is impaired with permanent disabilities as a result of his disfigured hands. "When these and other factors are properly considered under the standards discussed above, we cannot say that the trial judge abused his discretion in fixing the generous awards of general damages." Youn v. Maritime Overseas Corp., 623 So.2d at 1261. "The awards are not obviously the result of passion or prejudice, and they bear a reasonable relationship to the elements of the proved damages." Id. Accordingly, the trial court's general damage award is affirmed. [Emphasis added.]
In the present case, witnesses testified concerning Coleman's pain and suffering, as well as the other claims included under general damages.
Hilda Bradley's Testimony
Hilda Anderson Bradley testified that she lived with Coleman beginning in *1024 1986 at Crown Point near Lafitte, Louisiana. She stated that Coleman was a boxer, he would be in four or five fights a month, and he worked out on a regular basis. He was very strong and active. Coleman's son, Louis Coleman, Jr., was born on July 1, 1988 after the plaintiff lost his arm on June 11, 1988. Coleman was present at the birth. Hilda testified that: "When I had the baby, he just looked at me and said, `Lord, Jesus, I ain't going to be able to hold my child.'"
"When asked how the injury affected Louis' activities as a father to a son, Hilda stated: "It affected him big time bad. It really affected him. He can't be with his father like he want because he kind of afraid of him because he got one arm and I try to tell him he is still your daddy. He is still a man, but they look at him like he is a monster because he got that one arm and he is scared of him."
When asked about when she and Coleman stopped living with each other, Hilda replied: "After he got his arm cut off, he was like a whole totally different person like he wasn't a full man. He couldn't hold me and love me like he wanted to and he couldn't do what he wanted to with his kids, so he kept telling me, `Look, Red, go on with your life. Go find you somebody else. I can't do nothing for you all." And I kept saying, `Don't keep that confident [sic] like that. That's bad. We love you. We want to be here with you.' He just couldn't handle it."

Louis Coleman's Testimony
Coleman testified that after the operation, he woke up and went into the hall to use the phone. He looked down and saw that he had "nothing but a big bandage. And it tripped me out ... The first time I realized that I didn't have an arm they caught me in the hallway, they gave me a shot.... [I]t was a lot of tears shed. Oh, man, [Hilda] cried, I cried. I mean, you know, it wasn't nothing that she could actually tell me to make me feel no better, but she tried that, too." When asked if he could go back to boxing, Coleman stated: "It's something that I couldn'tin other words, waking up and finding something, a part of you, just gone overnight, it's nothing, you know, you can grasp to come to no conclusion of why or for what reason, and at the same time you looking at your life just it's not that no more. You're not the same person and man."
As a boxer, Coleman said he had fans but after he lost his arm, he stated: "Now it's like, you know, it's Mardi Gras, something to laugh at.... It's a joke to the people that I was involved with. It's a joke to most people that just don't understand." Coleman related that previously he was involved in recreation where, "I have thrown horseshoes, shot basketball, baseball, tennis. Just about every aspect of recreation that you could name, I was involved with." He no longer could ride his bicycle or fish. When Coleman was asked what things he missed doing with his kids, he replied, "Going to the park, wrestling. I used to take them to the gym with me when they were small ... and actually go into the gym. I can't do it. I refuse to go in the gym now because of the memories I have." Coleman said he can't play cards because it takes too long and everybody gets aggravated. He can't tie his shoes or put on a watch. He has difficulty feeding himself. Coleman stated that: "The hardest thing to do on a day-to-day basis everyday each day that I wake up is to make a dollar. That's the hardest thing. And I made money all my life. Even since I was a child I made money if it was no more than thirty-five cents bringing somebody groceries from the store. Now it's not like that anymore." When asked how he felt about his scar, he answered: "It hurts. It actually hurts because we talking about a person at manhood, born, grew up, played with all his *1025 neighbors, and all of a sudden here you are just like a crippled crab."

Dr. Richard Richoux's Testimony
Dr. Richard William Richoux specialized in psychiatry with a subspecialty of forensic psychiatry. Dr. Richoux saw Coleman 15 times from December 1991 until May 1997. Coleman had depression and anxiety that Dr. Richoux related directly to having lost his arm. Coleman was very sensitive as to how other people thought of him or what he thought other people thought of him. Dr. Richoux was convinced that Coleman's complaints were genuine. Dr. Richoux's diagnostic impression initially was that Coleman had a major depression and generalized anxiety. Dr. Richoux opined that the loss of an arm at the age of 32 would probably be significant enough stress to cause major depression in most people. He prescribed an antidepressant medication, Sinequan, and Valium as needed as an anti-anxiety drug that also aided in sleep. He recommended that Coleman be examined by Dr. Hersh because Coleman was experiencing physical pain. Dr. Richoux said that Coleman's diagnosis remained the same over four years. Dr. Richoux stated:
I don't think it's surprising at all [that] four years after the incident he felt that kind of sensitivity, particularly taking into account, you know, part of Mr. Coleman's history was being a boxer, a tough guy, somebody who could take care of himself. I got the impression that Mr. Coleman grew up in a fairly rough environment where people would not hesitate to get into physical fights with one another to settle disputes and things like that, and for someone with that background and who's used to working in physical capacities, losing an arm might mean more, even though it would be catastrophic for anyone that let's say a lawyer.
When asked if Coleman's financial stress was psychologically harmful, Dr. Richoux replied:
It is, expecially from the standpoint that it was my impression that a lot of Mr. Coleman's self image or self-esteem was derived from his ability to earn a living and help to support his family....
In October 1993, Coleman related to Dr. Richoux that he and Hilda split up after an altercation. The confrontation was related to Coleman's not being able to live up to his financial responsibilities and earn a living due to the loss of his arm.
Dr. Richoux was asked how other stresses in people's lives such as the death of loved ones compared with the stress of losing an arm. The doctor responded:
There have been lists made by psychologists, psychiatrists, whomever, over time trying to grade stressors [sic] or prioritize what are the highest and on down the line, and losses of one's own physical integrity are always right up at the top of the list. Certainly losses of spouses and losses of other close relatives are high up as well, but loss of one's own physical integrity is at the top of the list.
Dr. Richoux last saw Coleman in May 1997. Coleman moved to Marksville about that time, and it was difficult for him to find transportation to get to New Orleans for visits with Dr. Richoux. The doctor found that: "There is no doubt in my mind that [Coleman] suffered major depression because of the loss of his arm." Dr. Richoux concluded:
My prognosis was that in all probability he would continue to experience symptoms of depression, hopefully in a somewhat deintensified, lessened form as a result of being able to continue on medications. I felt it was important for him to be able to keep on getting medications and also getting supportive psychotherapy which is basically what I had *1026 been doing with him in addition to prescribing his medicine.
Thornton, supra, provides a guide in the present case for determining the effect of the particular injury to the particular injured person. Both claimants endured pain. Although Thornton withstood five minutes of excruciating pain, Coleman suffered pain while in Charity Hospital for a much longer duration from the time of his admittance in June 1988. The pain continued after the removal of his arm on June 11, 1988. Coleman asserts that on June 11, 1988, he woke up to find his left arm amputated at the shoulder. He went into shock and was sedated. He felt that he was not the same man that he was before. He was unable to engage in his previous life activities such as boxing and his employment as a heavy laborer.
Psychiatrist Dr. Richoux diagnosed the plaintiff's condition as "major depression" and anxiety, directly related to the loss of the arm. The plaintiff's depression resulted from the traumatic impact on the plaintiff's self-esteem. The plaintiff expressed that he was something to laugh at. He was self-conscious and he felt he could not have a normal relationship with women. His son was afraid of him because of his amputated arm. Hilda Bradley, the mother of his child, ended her relationship with the plaintiff after his arm was amputated. The plaintiff has difficulty doing many things that he could do easily prior to his amputation, including every day activities such as dressing and eating. Even if his boxing career were not successful, he missed the opportunity to include that activity in his daily life, something he had engaged in previously. Coleman was 32 years old, at the prime of his life. The record contains testimony upon which the jury could conclude that the affects of the injuries on Coleman's life and self-esteem were severe and devastating.
The Louisiana Supreme Court found that Dr. Deno's transferal of the plaintiff was not an intentional act but was the failure to treat the patient, which was part of his medical treatment, and was included in the statutory definition of malpractice. Therefore, the damages are limited to the LMMA's $500,000 cap. The amount of general damages is considered as a whole before being limited by the cap. This still includes consideration of the failure to timely treat the patient and the resulting affect on this plaintiff.
The Fund contends that the present case and Thornton, supra, are inapposite because Thornton involved the plaintiff's traumatic amputation without the benefit of anesthesia. Thornton's injuries and the effect of injuries on his ability to perform physically demanding jobs were taken into account.
Considering that Coleman endured prolonged pain from the delayed treatment of his infection as well as his arm amputation, that he lost his self-esteem with the loss of his arm, and that he was 32 years old at the time of the amputation, the general damage award of $4,400,000, is not so excessive as to constitute an abuse of the great, even vast discretion afforded the finder of fact in the assessment of damages. The general damage award is not a clear abuse of the "much discretion" of the trier of fact because it is not excessive for the particular injury and effect on the particular injured plaintiff under the circumstances.

AWARD FOR LOST WAGES AND LOSS OF FUTURE EARNING CAPACITY
Dr. Deno and the Fund assert that the $500,000 award for lost wages and loss of future earning capacity is excessive. Coleman maintains that the jury award should *1027 be affirmed. The record shows that witnesses testified concerning this award.

Testimony of John Links, Boxing Trainer
John Links, boxing promoter and trainer, testified that Coleman worked out on a daily basis. He explained that other countries and other states besides Louisiana required urine tests for boxing. Coleman never tested positive for drugs. He fought in Texas, Mexico, Jamaica, the United Kingdom, Connecticut, Mississippi and Alabama. Links testified that Coleman would have had "a very good career in boxing." He was a puncher. Links explained that: "If you got that punch, you got the makings of a champion." Although Coleman was not ranked before he lost his arm, Links agreed that Coleman had the potential to be a champion. After the plaintiff's attorney offered Links as an expert, Links stated: "If he would have kept fighting, been in good shape and I could have got the contract that I was trying to get with Butch Lewis Productions, Louis might have made 150, $200,000."

Louis Coleman's Testimony
The plaintiff, Louis Israel Coleman, testified that his last full-time job was in June 1988. Coleman actually only completed the seventh grade but was able to get to the eleventh grade because he played ball. When Coleman was 17, he went to work in Houston at B & B Construction doing heavy labor paying about five dollars an hour. After a year, Coleman went to work for a short time at M & M McBride Construction doing heavy labor. Coleman moved to New Orleans where he worked as a heavy laborer for Paul Piazza & Son in the seafood industry. He went to a plumbing repair trade school, Jefferson Vo-Tech. He worked in the plumbing industry as a plumber's helper for two companies. He was earning a little more than five dollars. He returned to Piazza & Son until early 1987. After that, Coleman worked on shrimp boats, loading and unloading shrimp for Bundy Seafood in Lafitte, Louisiana.
Coleman first started boxing in 1975 when he was 19 years old. He worked out and trained at Cole Boxing Club. Coleman testified that he was in "extremely perfect physical condition" and was in 32 professional fights. Coleman fought in Houston, Louisiana, Mississippi, Florida, and England. Coleman related that he never failed a drug test while he was boxing.
On cross-examination, Coleman stated that he could make $60-$120 a day at Bundy's Seafood in 1986-87. After the arm amputation, Coleman worked for his attorney as a court runner. He also picked up cans at the office and washed cars.

Testimony of Bobby Roberts
Bobby Roberts, a specialist in vocational evaluation, performed tests to determine a handicapped person's ability to work. He initially saw Coleman in 1989. Coleman had a poor educational background having finished the seventh grade and having been socially promoted up to the eleventh grade so he could play football in school. He stated that Coleman boxed throughout his young adult life and boxed both as a middle weight and on a heavy weight level. Coleman was employed as a laborer for construction companies and as a seafood worker, loading and unloading trucks with seafood. "He had done mostly heavy work throughout his life.... It required physical strength." Roberts remarked: "He worked for about four months in 1994 with Bundy where he was helping weigh up shrimp. He worked one month in 1995 with Bundy doing the same thing, and then between those times picked up aluminum cans and sold them." Roberts found that Coleman functioned at the Fourth Grade level or below. Coleman was on the borderline *1028 between being mentally deficient and below average. Roberts stated that: "His vision for distance was fine but all of his other motor and perceptual skills were the lowest scores possible." Roberts related that Coleman tested "[e]xtremely elevated, high levels of distress;" and Coleman "is almost functionally illiterate, has only done heavy manual work."
Roberts evaluated Coleman again in June 1991, and some test scores went up but Coleman remained in the same range as before. Roberts stated: "He had low manipulative or gross abilities to use the [right] hand. He had limited fine finger ability to use the hand and basically he was unable to successfully compete at any level of competitiveness." Roberts found that in 1991 Coleman could not compete for jobs in the open market. Roberts remarked that employment that was not on the competitive open market included jobs at sheltered work facilities such as Goodwill Industries, which were available in New Orleans. The sheltered work facilities paid less than minimum wage, with some workers being paid 25 percent of the minimum wage. Work is done on a piece rate basis so that faster workers could get more money beyond the 25 percent of the minimum wage level.
Roberts again recommended that: Coleman needed to see a psychologist or psychiatrist for counseling; Coleman needed structured therapy and a conditioning program; and Coleman should be fitted with a prosthesis. Roberts explained that: "as time goes on, you have more trouble rehabbing people."
Roberts did a third evaluation, finding that Coleman continued to have an extremely elevated symptoms profile and needed counseling. In nine years, Coleman "is still not at a competitive level but he has adapted, learned and is much better overall using one hand." In June 1998, Roberts had similar impressions of Coleman's abilities. Roberts opined that: "I don't think the future is going to change for him as far as his competitive employment is concerned...." Roberts noted that Coleman had seen Dr. Richard Richoux, a psychiatrist, intermittently and not consistently. Roberts felt that a prosthesis would not help Coleman function unless the fingers moved. Roberts was not optimistic about increasing Coleman's education. Roberts said that Coleman has no physical skills to offer and has no other skill base in his history besides physical skills.
Roberts was familiar with prostheses, and he indicated that a myo-electric prosthesis was required for Coleman. Roberts stated: "A traditional prosthesis that's fitted over a stump can be manual. When there's a transarticular amputation, that means that the joint is gone so the [prosthesis] has to be myo-electric. It can't be manual." Roberts agreed that Coleman would have to have special training to use the Utah myo-electric arm recommended by Lambert.
On cross-examination Roberts agreed that there are federal and state programs available to advance the subject's educational status; however, Roberts replied that generally it was not his position to recommend these programs but he suggested counseling and delivered a report to the referral source, the party requesting the report, such as the plaintiff's attorney in this case. Robert assessed whether a subject can do a certain job but Roberts did not make actual job placements.

Dr. Wolfson's Testimony
Dr. Melville Wolfson, professor of economics at UNO, has a law degree and a Ph.D. in economics and finance. He was qualified as an expert in the field of economics. Based on minimum wage, Dr. Wolfson calculated that Coleman would have earned $93,040 from the date of the *1029 injury up until the date of the trial. Based on $7.50 hourly wage and $60 daily or $300 weekly, taken from an employer's letter, Dr. Wolfson estimated that Coleman's past wage loss would be $167,582. Dr. Wolfson opined that Coleman's future lost wages would be based on 17.5 years. He determined that Coleman annually could have earned $15,600 or $211,912 as his future wage loss. Coleman's future earning capacity based on minimum wage would be $145,512. The average construction work hourly wage in 1996 was $15.50. Dr. Wolfson referred to the U.S. Department of Labor's figures that showed that in Louisiana in 1998, the average for carpenters' hourly wages was presently about $13.74. The $300 weekly figure estimate is less than half of that. Dr. Wolfson determined that the future medical expenses would be $493,024. Dr. Wolfson found that the minimum wage $300 weekly figure would calculate to $167,582 for past wage loss, $211,9012 for future wage loss and $104,746 personal services for a total of $484,240.

Nancy Favalora's Testimony
Nancy T. Favalora, vocational rehabilitation counselor, administered Coleman's testing. She found available jobs but she did not place the particular person in a particular job. She testified that Coleman is able to read. He scored at high school levels in English and 8th grade levels in arithmetic calculations. He had no current learning disability, and was of average intelligence, indicating that he could "learn new job tasks either through various type of training or demonstration or classroom work.... Mr. Coleman certainly would be able to return to various types of work either without additional training or with additional training that he would qualify for." Coleman told Ms. Favalora that he could drive.
Mr. Coleman was interested in substance abuse counseling. Ms. Favalora testified that Coleman could obtain a GED through the Louisiana Rehabilitation Service, and an associate's degree in substance abuse counseling offered at Southern University in New Orleans. Coleman could earn about seven dollars hourly when he obtained the associate's degree.
Coleman also showed an interest in being an x-ray technician. Another associate's degree for an x-ray technician vocational program was available at Delgado. Coleman could earn about nine or ten dollars hourly when he finished school. Coleman could still be a court runner. Ms. Favalora recommended a manually operated prosthesis rather than the myo-electric Utah arm because the manual arm was easier for an amputee to use. Ms. Favalora agreed that it would probably be difficult for Coleman to do manual labor.
In the present case, the plaintiff's prior history as a heavy laborer and boxer must be taken into account as in Thornton, supra. In Thornton, this Court found that an award of $731,429 for lost wages and loss of future earning capacity was not an abuse of the jury's great discretion where the plaintiff's hands were disfigured while he was working on a railcar. This Court noted:
... Mr. Thornton testified concerning his injuries and the effect of his injuries on his ability to perform physically-demanding jobs, which were the only types of jobs he had ever held. Moreover, Mr. Thornton testified concerning his job search. Mr. Thornton's vocational rehabilitation counselor testified that Mr. Thornton was unemployable as a result of his injuries, especially when combined with his age and his functional illiteracy. Moreover, one of the same vocational rehabilitation experts who said that jobs are available that Mr. Thornton can perform admitted that there are no guarantees that Mr. Thornton *1030 could find gainful employment given his past employment history and current limitations. In fact, she admitted that some of the available kitchen and bussing jobs she listed were not suitable given Mr. Thornton's hyperalgesia, which causes pain when his hands are in water. [Emphasis added.]
In the present case, Coleman was 32 years old and was earning $60 to $120 a day at Bundy Seafood at the time of his injury. Coleman testified that he had been working in heavy labor his whole life and had been actively pursuing a boxing career. Potentially, he may have succeeded in having a career in boxing. Considering that Coleman could not continue to be a heavy laborer because of the loss of his arm, the jury did not abuse its discretion in awarding the plaintiff $500,000 for lost wages and diminished earning capacity.

FUTURE MEDICAL EXPENSES
Dr. Deno and the Fund claim that the future medical expense award: (1) should not be assessed by the jury; and (2) is excessive.

(1) JURY'S ASSESSMENT OF DAMAGES
Dr. Deno and the Fund contend that the jury should not have assessed an amount for future medical care and related benefits. Future medical expenses should be assessed, managed and paid as incurred from the time of trial by the Fund.
In the original appellate opinion, this Court concluded that La.R.S. 1299.43(A)(1) provides that in a medical malpractice case, the jury should be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof.
In Accardo v. Cenac, 97-2320 (La.App. 1 Cir. 11/6/98), 722 So.2d 302, 312-313, the appellate court stated:
La. R.S. 40:1299.43 provides that medical malpractice victims may be awarded future medical care and related benefits, payable by the Fund, once a judgment is entered in favor of a patient who is found to be in need of the same. Payments for medical care and related benefits shall be paid by the patient's compensation fund without regard to the five hundred thousand dollar limitation imposed in La. R.S. 40:1299.42. La. R.S. 40:1299.43(D); Bijou v. Alton Ochsner Medical Foundation, 95-3074 (La.9/5/96); 679 So.2d 893. Our supreme court has held that the district courts are not vested with original jurisdiction or decision-making responsibility over future medical care claims, finding that the statutory provisions of the Medical Malpractice Act vest exclusive jurisdiction over medical and related care claims with the Patient's Compensation Fund Oversight Board, the agency legislatively assigned to administer the Fund. Kelty v. Brumfield, 633 So.2d 1210 (La. 1994). La. R.S. 40:1299.43(C) provides that once a judgment is entered in favor of a patient who is found to be in need of future medical care, the patient may make a claim to the patient's compensation fund through the board for all future medical care and related benefits.
In the present case, the judgment's notation of $500,000 to be awarded for future care and medical expenses is affirmed so as to trigger the applicability of La.R.S. 40:1299.43(C). The plaintiff must make any future claim for medical expenses to the Fund's Oversight Board when the expenses occur.

(2) CLAIM OF EXCESSIVE JURY AWARD FOR FUTURE MEDICAL EXPENSES
Dr. Deno and the Fund also assert that the amount of the jury award for future medical expenses was excessive and was *1031 based on the testimony of individuals who rendered opinions beyond their qualification.
Where alleged acts of negligence raise issues peculiar to a particular specialty involved, then only those qualified in that specialty may offer evidence of applicable standards. Soteropulos v. Schmidt, 556 So.2d 276 (La.App. 4 Cir.1990). It is the specialist's knowledge of the requisite subject matter, rather than the specialty within which specialist practices, which determines whether the specialist may testify as to the degree of care which should be exercised; a particular specialist's knowledge of the subject matter on which he is to offer expert opinion is to be determined on a case-by-case basis. Id.
In the present case, Dr. Deno maintains that various witnesses were not qualified to testify. Although Mr. Lambert was not a physician, he was qualified as an expert to testify concerning the availability of prosthetics. The trial court did not err in qualifying Lambert as an expert based on his twenty-year business experience in the field of making prosthetics. Dr. Deno maintains that there was no medical testimony that Coleman needs a prosthesis. Dr. James Butler, a Board certified orthopedist, wrote Coleman a prescription for a prosthesis without designating what kind of prosthesis should be used. It is reasonable to consider that an amputee without an arm would be eligible for a prosthesis, and that an owner of a company that fitted prosthetics had the qualifications to testify as to whether Coleman could be fitted for a prosthesis. Bob Roberts was properly found to be an expert in vocational evaluation, and properly testified regarding the plaintiff's medical need of a myo-electric arm for employment.
Various witnesses testified concerning the estimates for Coleman's future medical expenses.

Michael Lambert's Testimony
Michael E. Lambert, owner of Lambert's Orthotics and Prosthetics Patient Aids, testified that the company makes artificial limbs and braces. He has been in the business for almost 20 years, and the company has existed for over 40 years. Lambert had a Baccalaureate college degree in orthotics and prosthetics and a year's post-graduate degree course taken for a special certification, which Lambert acquired in 1982. Coleman had no humerus, which made the prosthesis more difficult to attach. Lambert gave a lifetime estimate for a shoulder disarticulation prosthesis, myo-electic type, with a Utah arm that was able to operate an electronic elbow or electronic hand. The total cost of the prosthesis would be $77,591. Lambert estimated that the prosthesis would have to be replaced every six years. Additional maintenance was $7,000 annually over 30 years. Lambert provided a figure of $907,281.99 for the lifetime estimate.

Orthopedist, Dr. James Butler's Testimony
Dr. Butler prescribed a prosthesis for Coleman. As previously noted in the original opinion, Dr. Butler testified that a prosthesis was reasonable and appropriate, assuming that the plaintiff desired it. Dr. Butler also testified that Coleman would need future medical care with doctor visits to monitor the prosthesis and replace it when it wore out or problems arose.

Psychiatrist, Dr. Richoux's Testimony
Dr. Richoux believed that Coleman would need future medical psychological treatment, consisting of monthly psychiatric sessions and continued permanent medication with adjustments. He said this would be the least amount of treatment necessary, but some psychiatrists would *1032 recommend that Coleman should be seen weekly.
Considering that Lambert projected that treatment including a myo-electric prosthesis would be $900,000, the jury did not abuse its discretion in determining that the plaintiff's future medical expenses, which also included psychiatric treatment, would be $500,000 over a thirty year period.

THE FUND'S CREDITS UNDER THE CAP
Dr. Deno maintains that under La. C.C. art. 1803, the recoverable damages would have been $500,000 plus future medical expenses. Dr. Deno asserts that an allocation of 75 percent to Charity would have resulted in a maximum award of $125,000 against Dr. Deno. However, the general damage award against Dr. Deno would be 25 percent of $4,900,000 or $1,225,000. Because this amount is over $500,000, the amount of recoverable damages from Dr. Deno and the Fund must be determined pursuant to the limitations of the cap.
In a medical malpractice action, the plaintiff's recovery is limited to one $500,000 damage cap, plus interest and costs, even if the liability of some defendants is controlled by the LMMA and the liability of others is controlled by the MLSSA, given that the cause of action arose out of only one single instance of negligence. Williams v. O'Neill, 99-2575 (La.App. 4 Cir. 3/13/02), 813 So.2d 548, writ denied, XXXX-XXXX (La.5/24/02), 816 So.2d 859.
La. R.S. 40:1299.42B(2) limits the liability of Dr. Deno, a qualified health care provider, to $100,000 plus interest. The Fund is liable for the amount inexcess of the total liability of the health care providers. La. R.S. 40:1299.42B(3)(a) states in part:
Any amount due from a judgment ... which is in excess of the total liability of all liable health care providers, as provided in paragraph (2) of this Subsection, shall be paid from the patient's compensation fund pursuant to the provisions of R.S. 40:1299.44.
In the present case, the Louisiana Supreme Court found that Charity Hospital is liable for 75 percent of the damage award. However, prior to trial, the plaintiff settled with Charity for $25,000 and with JoEllen Smith Hospital for $10,000.
This Court noted the following in the original opinion, Coleman v. Deno, pp. 50-54, 787 So.2d at 480-482:
... [A]t issue is what amount of credit will the Fund receive for the two settlements.
Decisions interpreting La. R.S. 40:1299.44(C)(5) have made it clear that once one health care provider has settled for $100,000, liability for malpractice is admitted and the only issue between the victim and the Fund is the amount of damages. In Stuka v. Fleming, 561 So.2d 1371, 1374 (La. 1990), cert. denied, 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990), the Louisiana Supreme Court stated:
The Medical Malpractice Act therefore contemplates that the issue of liability is generally to be determined between the malpractice victim and the health care provider, either by settlement or by trial, and that the Fund is primarily concerned with the issue of the amount of damages. Payment by one health care provider of the maximum amount of his liability statutorily establishes that the plaintiff is a victim of that health care provider's malpractice. Once payment by one health care provider has triggered the statutory admission of liability, the Fund cannot contest that admission. The only issue between the victim and the Fund thereafter is *1033 the amount of damages sustained by the victim as a result of the admitted malpractice.
However, in the present case the two settlements ($25,000 with Charity and $10,000 with JoEllen Smith Hospital) were for less than $100,000 each so that the issue remains as to whether liability must be proved before the Fund can receive credit for the settlements.
The Medical Malpractice Act, La. R.S. 40:1299.42 D(5), provides:
In the event that a partial settlement is executed between the defendant and/or his insurer with a plaintiff for the sum of one hundred thousand dollars or less, written notice of such settlement shall be sent to the board. Such settlement shall not bar the continuation of the action against the patient's compensation fund for excess sums in which event the court shall reduce any judgment to the plaintiff in the of malpractice liability insurance force as provided for in R.S. 40:1299.42(B)(2).

* * *
In Thomas v. Insurance Corp. of America, 93-1856 (La.2/28/94), 633 So.2d 136, the Louisiana Supreme Court interpreted La. R.S. 40:1299.42D(b) to allow $100,000 credit for one settlement and then a dollar-for-dollar amount for the second settlement. The Supreme Court stated:
[The scheme for medical malpractice claims, as set up by the Legislature and interpreted in the jurisprudence, does not contemplate that litigation be required against each and every negligent health care provider. It surely permits the health care providers to effect settlements, which our judicial system favors. However, if the Fund were permitted a maximum credit for even a "nuisance value" settlement, the claimant would not likely compromise with any malpractice defendant who did not offer to pay its maximum, $100,000 liability. On the other hand, the defendants' incentive for settlement arguably is also lessened, if only one $100,000 credit is allowed for multiple defense settlements. And equally as important, since the Medical Malpractice Act prevents the claimant from recovering more than $500,000 plus interest and cost for all malpractice claims for injuries to or death of a patient, an interpretation of the statute that only a single, $100,000 credit to the Fund is authorized may well prompt violation of this basic limitation on the claimant's recovery. Should multiple settlements total more than $100,000 and damages reach or exceed the Fund's maximum exposure of $400,000, the claimant would recover more than $500,000, despite the prohibition of Section 40:1299.42(B)(1).]
Accordingly, in the case of multiple settlements, a single settlement between a defendant and/or his insurer and the plaintiff for a sum of $100,000, or less than $100,000 but more than any other of multiple settlements, shall reduce by $100,000 any judgment in favor of the plaintiff to be paid by the Patient's Compensation Fund. Each other settlement shall reduce the amount due by the Fund by the amount of that settlement.
Id. [pp. 7-8], 633 So.2d at [141].

* * *
We conclude that La. R.S. 40:1299.42(D)(5) does not require that credit can be given only to the defendants who are found liable for the reasons *1034 expressed by the Second Circuit as cited above.
In the present case the larger settlement was in the amount of $25,000. This is the amount that is calculated for the $100,000 credit to the Fund for the settlement with Charity. The Fund is entitled to an additional credit of $10,000 for the second settlement with JoEllen Smith Hospital for a total of $110,000 for the medical malpractice settled claims.
With respect to the credit for Dr. Deno's liability, any amount due up to the cap in excess of the total liability of the qualified health care providers must be paid by the Fund. La. R.S. 40:1299.42(B)(3)(a).
To reiterate, the Fund is entitled to a credit of $100,000 for the settlement with Charity Hospital and a credit of $10,000 for the settlement with JoEllen Smith Hospital, as well as credit for another $100,000 for the liability portion to be paid by Dr. Deno.

AWARD TO SON FOR LOSS OF CONSORTIUM
An award for loss of consortium includes the loss of service, love and affection, society and companionship, support, overall contentment and happiness. Vaccaro v. Sports & Imports, Inc., 539 So.2d 989 (La.App. 4 Cir. 1989), writ denied, 541 So.2d 1391, 1392 (La. 1989).
In this Court's original opinion, it is noted that the consortium claim of the plaintiff's son was extinguished by the quantum awarded the plaintiff. As previously noted, in Annand v. State, Dept. of Health and Human Resources, 97 2958 (La.App. 1 Cir. 2/23/99), 729 So.2d 1085, 1094-1095, writ denied, 99-0842 (La.5/14/99), 741 So.2d 661, the First Circuit found that the cap includes any derivative claims that arise from the same act of malpractice. In Hollingsworth v. Bowers, 96-257 (La.App. 3 Cir. 12/30/96), 690 So.2d 825, where the damages awarded a child injured during child birth exceeded the medical cap, the mother's derivative claim for loss of consortium was extinguished.
In the present case, the son's loss of consortium claim is derivative of the claim of his father. The consortium award was extinguished because the quantum awarded the plaintiff exceeded the $500,000 cap. The original judgment of the trial court is affirmed as amended to delete the pro rata share for the son's consortium claim under the LMMA's $500,000 cap.

FINAL REVISED DAMAGES
The jury's quantum award for general damages, as well as the damage award for lost wages and loss of future earning capacity, are affirmed; however, the plaintiff's recoverable damages are limited by the LMMA's $500,000 cap. The award for loss of consortium is not allocated against the Louisiana Patients' Compensation Fund. As a health care provider, Dr. Deno's liability is limited to $100,000 plus interest, and the Fund must pay the remainder under the $500,000 cap plus interest but credit for the settlements is also deducted. The Fund is given $110,000 credit for the settled claims against Charity Hospital and JoEllen Smith Hospital.
Accordingly, Dr. Deno is liable to pay the plaintiff $100,000 plus interest. Subtracting $100,000 representing credit for Dr. Deno's portion, and subtracting $110,000 additional credit for the two settlements, under the $500,000 cap, the Fund is liable for the remaining $290,000 plus interest. Further, the notation of $500,000 for future medical expenses is affirmed, and is to be administered by the Fund.
ON REMAND FROM THE LOUISIANA SUPREME COURT: AFFIRMED AS AMENDED.
*1035 ORDER
REHEARING DENIED AS AMENDED:
On rehearing, this court's opinion on remand, Coleman v. Deno, 99-2998, p. 26 (La.App. 4 Cir. 11/6/02), 832 So.2d 1016, is amended to delete the sentence, "If Charity Hospital had not settled, its liability would be limited to $100,000 plus interest as a qualified healthcare provider." See the Malpractice Liability for State Services Act ("MLSSA"), La. R.S. 40:11299.39. The remainder of the opinion on remand remains the same. The Louisiana Patients' Compensation Fund's application for rehearing is denied as amended.
[Editor's Note: Amendment incorporated for publication purposes.]
/s/ William H. Byrnes, III
WILLIAM H. BYRNES, III, Chief Judge
/s/ Steven R. Plotkin
STEVEN R. PLOTKIN, Judge
/s/ Miriam G. Waltzer
MIRIAM G. WALTZER, Judge
/s/ Dennis R. Bagneris, Sr.
DENNIS R. BAGNERIS, SR., Judge
/s/ Michael E. Kirby
MICHAEL E. KIRBY, Judge
NOTES
[1] Pursuant to the provisions of the LMMA, the plaintiff is required to submit bills for needed medical treatment in the future to the Patient's Compensation Fund for approval on a per-submission basis.